No. 72–1740. Sennott et ux. *v.* Rodman & Renshaw. C. A. 7th Cir. Certiorari denied. ▮▮▮▮▮▮▮▮▮

Mr. Justice Douglas, with whom Mr. Justice Blackmun concurs, dissenting.

The petitioners brought this action in district court for securities fraud against Rodman & Renshaw (Rodman), a registered broker-dealer in securities and member firm of the New York Stock Exchange; William Rothbart, a partner in the firm; and Jordan Rothbart (Jordan), William's son. After a bench trial, the District Court found all three defendants liable. Respondent

Rodman then appealed and the Court of Appeals reversed, 474 F. 2d 32 (CA7 1973), finding no basis on which to hold Rodman liable for the concededly illegal and fraudulent scheme.

Both Sennott and Jordan were members of the Chicago Board of Trade, although Sennott had little experience in securities investments. They became acquainted and Jordan urged Sennott to open an account at Rodman through him, saying that his father had made money for other Board of Trade members. Ultimately Sennott agreed and between 1964 and 1966 his trading volume in the accounts at Rodman was more than $2 million, 70% of which was through accounts opened by Jordan.[1]

Unknown to Sennott during this period, Jordan's employment by Rodman had been terminated because of his questionable integrity, and he had no official connection with the firm after 1958. The Securities and Exchange Commission had held in a 1962 order that between 1955 and 1957 Jordan, while employed by another broker-dealer, had violated various antifraud provisions of the Securities Act. In 1958 his registration as a representative of a member of the National Association of Securities Dealers had been revoked because of deceptive practices.

In early 1964 Jordan induced Sennott to invest in a secondary offering by Skyline Homes, Inc., that Rodman was handling. Soon after, Jordan encouraged him to buy additional shares of Skyline through stock options made available to William, his father, for the father's services in underwriting the secondary offering. Sennott ultimately invested $142,000 in these options. They did not

---

[1] The typical transaction involved Jordan's telling Sennott that his father recommended a particular buy or sell, obtaining Sennott's agreement, and calling in the order on the special Rodman phone at the Board of Trade. The orders were processed by William Rothbart and the firm collected the regular broker's fee on them.

exist and Jordan placed the money in his wife's checking account to use in paying off trading losses. Suspicion did not arise immediately because the options were not due for delivery for seven months. After that, Jordan was able to hold off Sennott's suspicions with various stories.

In October 1964, Sennott was told that Rodman's managing partner, Carroll, wanted to talk to him. William Rothbart told Sennott that the options were none of Carroll's business and that Sennott should not cooperate. William and Jordan accompanied Sennott to his meeting with Carroll, where Carroll revealed that Sennott's checks had been deposited in Jordan's wife's account. But Sennott abided by his agreement with William not to cooperate with Carroll, and Jordan was again able to explain away this suspicious circumstance.[2] William assured Sennott he would receive the options. The truth finally dawned on Sennott in 1966 when he found that another member of the Board of Trade had been the victim of a similar scheme of Jordan's; Sennott also discovered Jordan's past at this time. Jordan was expelled from the Board of Trade.

On the basis of these facts the trial judge found Rodman, as well as Jordan and William, liable. Rodman's liability was based, *inter alia*, on § 20 (a) of the Securities Exchange Act of 1934 (15 U. S. C. § 78t), which is set out below.[3] The Court of Appeals reversed, finding

---

[2] Jordan had previously told Sennott that he was also buying some of the options. He explained that he had put all the money together so that he could pay for all options in one check.

[3] Section 20 (a) provides: "Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U. S. C. § 78t.

that there could be no liability under this section because Rodman did not have advance knowledge of the option scheme and was not involved in it.

We have said repeatedly that "the 1934 Act and its companion legislative enactments embrace a 'fundamental purpose . . . to substitute a philosophy of full disclosure for the philosophy of *caveat emptor* and thus to achieve a high standard of business ethics in the securities industry.'" *Affiliated Ute Citizens* v. *United States,* 406 U. S. 128, 151 (1972), quoting *SEC* v. *Capital Gains Bureau,* 375 U. S. 180, 186 (1963). "'[It is essential] that the highest ethical standards prevail' in every facet of the securities industry." *SEC* v. *Capital Gains Bureau, supra,* at 186–187, citing *Silver* v. *New York Stock Exchange,* 373 U. S. 341, 366 (1963).

Section 20 (a) provides that anyone who "controls" a person liable under the 1934 Act is equally liable, subject only to the defense of "good faith." The section "is remedial and is to be construed liberally. It has been interpreted as requiring only some indirect means of discipline or influence short of actual direction to hold a 'controlling person' liable." *Myzel* v. *Fields,* 386 F. 2d 718, 738 (CA8 1967). See 3 L. Loss, Securities Regulation 1808–1811, and cases cited in *Myzel* v. *Fields, supra,* at 738.

Rodman's liability for the acts of its partner, William Rothbart, are indisputable under § 20 (a), as they are under general principles of agency. But liability cannot be confined to those formally authorized to act in the firm's behalf, for such a rule would constrict the common-law principles of apparent authority, a construction inconsistent with the broad remedial purpose of the legislation.[4] The purpose of the Act is to expand, not restrict, the public's remedies.

---

[4] "The Court does not believe that in using the word 'controls' the Congress intended that degree of control or the right to direct

Here Rodman accepted the orders placed through Jordan for over two years, collecting profits on over $2 million worth of securities transactions. It allowed Jordan to place those orders through its phone on the floor of the Board of Trade, which was under the control of a Rodman employee and was used by only two people besides Jordan—a Rodman partner and a Rodman broker. The District Court found that during this period Jordan solicited orders for Rodman in the same way from at least five others on the floor of the Board of Trade. As the Court of Appeals concedes, Rodman cannot claim lack of knowledge of these activities of Jordan's. Yet in allowing Jordan to hold himself out as an agent of Rodman, with special access because of his association with one of its partners, and accepting the considerable benefits of Jordan's activities, Rodman must be responsible for Jordan's acts even under general agency principles—which do not require even that the principal benefit from the apparent agent's fraud. Restatement (Second) of Agency §§ 261–262. Agency principles have been applied to find liability on facts almost identical to those here. *Blackburn* v. *Witter,* 201 Cal. App. 2d 518, 19 Cal. Rptr. 842 (1962). It is clear that § 20 (a) compels the same result, *SEC* v. *First Securities Co. of Chicago,* 463 F. 2d 981 (CA7), cert. denied *sub nom. McKy* v. *Hochfelder,* 409 U. S. 880 (1972).

Having knowingly acquiesced for two years in Jordan's

necessary to make out a common law relationship of principal-agent or employer-employee." *Hawkins* v. *Merrill Lynch, Pierce, Fenner & Beane,* 85 F. Supp. 104, 123 (WD Ark. 1949), quoted in 3 L. Loss, Securities Regulation 1810. "Although the cases holding a controlling person liable usually involve employees . . . the Acts are not limited to this relationship." *Anderson* v. *Francis I. duPont & Co.,* 291 F. Supp. 705, 710 (Minn. 1968).

usurpation of authority in order to gain the benefits, Rodman cannot suddenly disclaim liability. In the option fraud Jordan purported to act through William, a Rodman partner, just as he purported to act with Rodman's consent in the earlier sales, for which Rodman accepted the profits without complaint. In buying the options Sennott was obviously relying on Rodman's purported association with Skyline.

Nor can Rodman interpose the defense of good faith where it knew of Jordan's history of questionable practices but did nothing to warn Sennott. "[T]o satisfy the requirement of good faith [in order for a controlling person to avoid liability thereby] it is necessary for the [controlling person] to show that some precautionary measures were taken to prevent the injury suffered." *SEC* v. *First Securities Co. of Chicago, supra,* at 987. See also *Lorenz* v. *Watson,* 258 F. Supp. 724, 732 (ED Pa. 1966); *Hecht* v. *Harris, Upham & Co.,* 283 F. Supp. 417, 438 (ND Cal. 1968).

The District Court here found Rodman to be a controlling person under § 20 (a) and therefore liable to Sennott. I cannot see how that determination can be held clearly erroneous. Moreover the decision in the Court of Appeals below appears to conflict with the principles applied in *Myzel* v. *Fields, supra; SEC* v. *First Securities Co. of Chicago, supra; Anderson* v. *Francis I. duPont & Co.,* 291 F. Supp. 705 (Minn. 1968).

I would grant certiorari.