Rhonda Kaye GOLDSTEIN et al.

v.

REGAL CREST, INC., et al.,
Civ. A. No. 70–2910.

United States District Court,
E. D. Pennsylvania.

March 26, 1974.

**572**

Thomas C. Kubelius, Bethlehem, Pa., for plaintiffs.

Fred C. Aldridge, Jr., C. Gary Wynkoop, Philadelphia Pa., for defendants.

## MEMORANDUM AND ORDER

HUYETT, District Judge.

The complaint in this action is in six counts. Each count alleges a cause of action arising out of an alleged scheme to defraud the plaintiffs in the sale of stock of International Resources Incorporated (IRI). Count 1 alleges a cause of action under § 12(2) in that the defendants are alleged to have sold securities of IRI by means of a prospectus containing untrue and misleading material statements and in omitting to state material facts. Count II alleges a scheme to defraud the plaintiffs in violation of § 17(a)(1), (2) and (3) of the Securities Act of 1933, 15 U.S.C. § 77q(a)(1), (2) and (3). Count III alleges fraud in connection with the purchase and sale of IRI stock and in connection with the merger of IRI with Regal Crest in violation of the Securities Exchange Commission's Rule 10b–5, promulgated under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b). Count IV alleges a violation of SEC Rule 10b–6 arising out of the defendants' alleged conduct during the distribution of IRI stock. Count V alleges the sale of unregistered securities in violation of § 12(1) of the Securities Act of 1933, 15 U.S.C. § 77l(1). Finally, Count VI alleges a cause of action under common law fraud, neglect, breach of trust, mismanagement, malfeasance and nonfeasance.

Defendant Fahnestock & Co. has moved pursuant to Fed.R.Civ.P. 12(b)(6) to dismiss the cause of action under Rule 10b–6 (Count IV) for failure to state a claim upon which relief can be granted and has moved pursuant to Fed.R.Civ.P. 56(b) for summary judgment as to the claim under Rule 10b–5 arising out of the merger of IRI and Regal Crest. The Rule 10b–5 merger claim and the Rule 10b–6 claim are the only claims we have permitted to go forward as a class action. Goldstein Regal Crest, 59 F.R.D. 396 (E.D.Pa. 1973). In the wake of our ruling disallowing class action treatment under the remaining counts of the complaint, various persons have moved to intervene as plaintiffs. We deal first with defendant Fahnestock's motion to dismiss and for summary judgment.

### I. The Alleged Fraudulent Scheme

Plaintiffs allege a complicated scheme engaged in by defendants to defraud persons who purchased the stock of International Resources, Inc. (IRI) from salesmen in the Bethlehem office of Fahnestock & Co. (Fahnestock).[1] Plaintiff's claim that the stock was sold to the general public without the registration statement required by Section 5 of

---

1. Defendants in the present action include John Pruso, Doris B. Baron, George H. Young and Maurice Pollon, who were all directors, officers and principal shareholders in IRI; Fahnestock & Co., a member of New York Stock Exchange doing business in Bethlehem, in whose offices the alleged illegal sales were made; Frank Lawson, the manager of Fahnestock's Bethlehem office; and Regal Crest, Inc. (Regal Crest), the successor in interest to IRI. The salesmen in the Fahnestock offices who allegedly made the sales were not named as defendants in this action.

the 1933 Act, 15 U.S.C. § 77e, although the sale did not qualify for the exemption in Section 3(a)(11) of the 1933 Act, 15 U.S.C. § 77c(a)(11), and the number of purchasers exceeded the twenty-five permitted in Pennsylvania law for an intrastate offering, Section 2(f)(10) of the Pennsylvania Securities Act, Pa.Stat.Ann. tit. 70, § 32(f)(10). The scheme involved the use of escrow agreements which salesmen gave to purchasers to evidence the sale of the stock without requiring the transfer of stock until after the proper registration had been made.[2] Plaintiffs allege that in attempting to persuade them and members of the public to purchase this stock, the salesmen employed in the Fahnestock office and controlled by the defendants in this action used misrepresentations and omissions of material facts. These included misrepresentations of the prospects of the stock and the interest of Bethlemen Steel Co. and United States Steel Co. in purchasing IRI, and the failure to disclose certain material facts concerning stock-splits, stock options, registration difficulties and other significant matters.

Plaintiffs also complain that after the sales had been made defendants continued to misinform them in order to prevent them from bringing a lawsuit similar to this one. They charge that defendants issued a false prospectus in September, 1969, which did not list them as shareholders, in order to deceive them into believing that the stock would eventually go public. They also allege that defendants made misrepresentations in February, 1970 concerning a redemption fund in order to prevent plaintiffs and others from filing an action.

In June, 1970, IRI merged with Regal Crest. Plaintiffs assert that they were never notified of the impending merger nor were they given the opportunity to vote on it. The only information they received was from a newspaper release which contained false data about the merger.

## II. Rule 10b–6 Claim

■ With respect to the Rule 10b–6 claim, plaintiffs allege that defendants Pruso, Baron and Young were the issuers of IRI stock; Fahnestock, Lawson, Fahnestock's general manager in its Bethlehem office, and its various employees were borkers and dealers participating in the distribution of IRI stock. Pruso is alleged to have delivered 55,000 shares of IRI stock to Ronald Hoffman, a trainee in Fahnestock's Bethlehem office. With the knowledge and consent of Lawson, Hoffman along with other Fahnestock employees, sold 55,000 shares of stock knowing that the stock was unregistered. The complaint states: "All the defendants conspired to make a market in the stock in the City of Bethlehem and had knowledge of sales being conducted actively to the public in general and to the plaintiffs in particular." [¶ 15(c)] Fahnestock contends that these factual allegations fail to raise a claim under Rule 10b–6. We agree.

Rule 10b–6 is one of three SEC rules governing the activities of persons interested in a distribution of securities and of rights to purchase securities.[3] The

---

2. The escrow agreements, which appear to have been uniform, read:

"I hereby certify that I, (name of salesman) am holding in escrow for (name of purchaser) (number of shares) shares of investment in International Resources, Inc. to be transferred to your name after 31 days when the stock goes public.

                (Signature of salesman)
(Signature of purchaser)"

3. 17 C.F.R. §§ 240.10b–6, 240.10b–7 and 240.10b–8 (1973). Rule 10b–6 provides in relevant part:

(a) It shall constitute a "manipulative or deceptive devise or contrivance" as used in section 10(b) of the act for any person,

(1) Who is an underwriter or prospective underwriter in a particular distribution of securities, or

rules represent a careful balance between the interests of the investing public in being free from manipulative devices which tend to artificially affect the price at which a security is being offered and the interests of corporate financiers whose distribution of securities, by a sudden increase in the supply of securities in the market, tends to cause a decrease in the price of the security being offered not reflective of the true market value.[4] Efforts made by persons interested in a distribution to prevent a decline in the open market price of the security being distributed are referred to as stabilizing activities. These stabilizing activities generally consist of the bidding for or the purchase of the securities being distributed by persons involved in the distribution for the purpose of "pegging" or "fixing" the price of the security.[5] Stabilizing activities not performed in accordance with Rules 10b–6, 10b–7 and 10b–8 constitute an unlawful manipulative device violative of §§ 9(a)(6) (when performed on an exchange) and 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78i(a)(6) and 78j(b).[6] Thus, even though stabilization is admittedly a manipulative device, its use in accordance with the rules is deemed necessary to facilitate corporate financing.[7] And, of course, the rules are clearly violated when purchasing the stock being distributed is not for the purpose of stabilization but simply to give a false impression of active trading.

(2) Who is the issuer or other person on whose behalf such a distribution is being made, or

(3) Who is a broker, dealer, or other person who has agreed to participate or is participating in such a distribution, directly or indirectly by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, either alone or with one or more other persons, to bid for or purchase for any account in which he has a beneficial interest, any security which is the subject of such distribution, or any security of the same class and series, or any right to purchase any such security; or to attempt to induce any person to purchase any such security or right, until after he has completed his participation in such distribution: . . . . *See generally*, Foshay, Market Activities of Participants in Securities Distributions, 45 Va.L.Rev. 907 (1959).

4. Securities and Exchange Act Release No. 2446 (1940).

5. 17 C.F.R. § 240.10b–7(b)(3) (1973).

6. The prohibition of the rule is absolute; a registrant does not escape liability simply because his purchases and bids do not result in a rise in the price of the securities distributed. See Note, The SEC's Rule 10b–6: Preserving A Competitive Market During Distributions, 1967 Duke 809, 829.

7. For a description of modern underwriting techniques, see 1 Loss, Securities Regulation at 163–171.

One of the most significant features of modern-day corporate financing is the sale of a securities offering at a specific price to a syndicate or group of underwriters and dealers. The underwriting group must then sell the securities quickly in order to realize a return on their purchase. They buy from the issuer anticipating an immediate distribution at the price offered in a new issue or at the price the securities are selling on the market. The decrease in price caused by a sudden sale of a large number of securities during a distribution necessitates some assurance that the price will not fall so low that the underwriters will be prevented from receiving an adequate return on their purchase from the issuer. Stabilization activities provide this assurance. Securities Exchange Act Release No. 2446 (1940).

The assurance provided by stabilization is, however, significant only if the offering is neither a complete success nor an utter failure. "[I]f the selling pressure gets too heavy to permit the constant 'pegging' of the market, the syndicate bid is usually dropped to successively lower levels or it may be withdrawn altogether. For the same reason, stabilization cannot be used as a practical matter to stem a market or economic trend of any real significance. On the other hand in the case of a particularly successful issue, stabilization is unnecessary because the market usually takes care of itself. Thus, as the Commission has observed, 'stabilization is regarded as necessary only in the case of issues which are neither notable successes nor notable failures.'" [footnote omitted] 3 Loss, Securities Regulation at 1572 (2d ed. 1961).

Rule 10b–6 sets forth the activities which are prohibited and persons whose activities are prohibited during a distribution of securities. Rule 10b–7 prescribes when stabilizing may commence, the disclosures and reporting required in order to stabilize and the price at which stabilization is permissible.[8] Rule 10b–8 deals with requirements tailored to the special difficulties involved in a rights' offering. Since transactions pursuant to Rule 10b–7 and 10b–8 are exempt from the prohibition of Rule 10b–6, a violation of either 10b–7 or 10b–8 also constitutes a violation of 10b–6.[9]

Among the activities proscribed by Rule 10b–6 by persons participating in a distribution are (1) the actual purchasing of the distributed security, (2) the bidding for the distributed security, (3) purchasing of similar securities or of securities of the same class and series, (4) sales to persons who hold accounts beneficial to the person involved in the distribution, and (5) purchases by the issuer of the securities being distributed.[10] Thus, it is clear that 10b–6 "prohibits trading only in the sense of buying, not selling." 3 Loss, Securities Regulation at 1596 n.119 (3d ed.1961).

The complaint before us wholly lacks allegations of fact necessary to establish a claim under Rule 10b–6. The complaint sets forth a series of transactions by the defendants in which stock of IRI by means of escrow agreements were sold to the plaintiffs. There are no allegations that the defendants sold to accounts in which they had a beneficial interest or that they engaged in transactions designed to artificially affect the price of the stock being distributed. The complaint sets forth facts which if true establish a garden-type variety of fraud in the sale of stock to the plaintiffs consisting of material misstate-ments and omissions of fact. There are no allegations that the defendants attempted to affect the price of the stock being distributed. Compare Weitzen v. Kearns, 271 F.Supp. 616 (S.D.N.Y.1967) with SEC v. Scott Taylor & Co., 183 F.Supp. 904 (S.D.N.Y.1959). See also, Jaffee & Co. v. SEC, 446 F.2d 387 (2d Cir.1971); Chris-Craft Industries v. Bangor Punta Corp., 426 F.2d 569 (2d Cir.1970); R. A. Holman & Co. v. SEC, 366 F.2d 446 (2d Cir.1966) opinion modified on rehearing, 377 F.2d 665 (2d Cir.), cert. denied, 389 U.S. 991, 88 S. Ct. 473, 19 L.Ed.2d 482 (1969) rehearing denied, 389 U.S. 1060, 88 S.Ct. 767, 19 L. Ed.2d 867 (1968); Miller v. Steinbach, 268 F.Supp. 255, 279 (S.D.N.Y.1967); SEC v. Electronics Security Corp., 217 F.Supp. 831, 835–836 (D.Minn.1963).

### III. Rule 10b–5 Merger Claim

In support of its motion for summary judgment on the merger claim in Count III, Fahnestock submits an affidavit by M. Donald Grant, a senior partner in the firm. The affidavit states that IRI filed on September 16, 1969 a registration statement with the SEC for the public offering of 720,000 units consisting each of one share of common stock (.10 par value) and one attached warrant to purchase common stock. On October 30, 1969 Fahnestock was requested by Toby & Kirk, a registered broker-dealer who had entered into a contract with IRI to act as the managing underwriter for the proposed offering, to become a member of the selling group in connection with the IRI offering.

Fahnestock learned on October 31, 1969 that the registered statement filed on behalf of IRI disclosed that from June 19, 1968 to December 10, 1968 IRI had sold unregistered shares of its com-

8. Stabilizing at the market "in which it is contemplated that any offering price set in any calendar day will be increased more than once during such day" is prohibited by the rule. 17 C.F.R. § 240.10b–7(b)(1) and (g) (1973). See also, Separate Statement of Commissioner Healy, Securities Exchange Act Release No. 2446.

9. See 3 Loss, Securities Regulation at 1596 (2d ed. 1961).

10. See Note, 1967 Duke supra at 829–840.

mon stock to 15 purchasers. Of the 202,625 shares sold during this period, 54,625 shares were sold to Ronald S. Hoffman. Fahnestock also learned that the shares sold to Hoffman "were not beneficially owned by him but were held in escrow for a number of investors who had originally given him checks covering the investors' respective shares of the stock in return for which he had given the investors escrow receipts stating that he was holding such shares as escrow agent for the investors and would deliver such shares to the investors within thirty-one days after the company went public". [Affidavit of Grant p. 3]

Because of these facts, the affidavit continues, Fahnestock refused to participate in the distribution and informed the concerned regulatory agencies about its findings. On December 1, 1969, Fahnestock terminated the employment of its employees in the Bethlehem office involved in the escrow sales.

Finally, the affidavit asserts that neither Fahnestock, its agents or employees had any knowledge, notice or participation in a proposed merger of IRI with Regal Crest which is alleged to have been consummated on June 30, 1970. The sales of escrow receipts were never recorded in Fahnestock's books. The private records of Fahnestock's employees in its Bethlehem office relating to sales of escrow receipts were seized and delivered to the SEC in the fall of 1969 and remained in the custody of the SEC until 1972.

Plaintiffs have not filed affidavits opposing the motion, nor have they filed affidavits stating any reason why they cannot present by affidavit facts essential to justify their opposition to the motion. See Fed.R.Civ.P. 56(f). A party opposing a motion for summary judgment cannot rest on the pleadings. Fed.R.Civ.P. 56(e).

Despite plaintiffs' utter disregard for Fed.R.Civ.P. 56, we are constrained to deny defendant Fahnestock's motion for summary judgment. The Grant affidavit does not eliminate material issues of fact which may exist concerning the activities by Fahnestock employees while employed by Fahnestock which prevented plaintiffs from knowing of the proposed merger. No facts are known concerning when the merger was first proposed and whether Fahnestock employees then knew of the merger. *Cf. Sennott v. Rodman & Renshaw,* 474 F.2d 32 (7th Cir.), cert. denied, 414 U.S. 926, 94 S.Ct. 224, 38 L.Ed.2d 160 (1973). Many of the facts concerning the merger are exclusively in the control of the defendants. We are reluctant, therefore, to grant summary judgment on the merger claim without knowing more facts about the merger and the Fahnestock employees' involvement. See 6 Moore, Federal Practice ¶ 56.24 at p. 2871.

### IV. Motions to Intervene

On June 27, 1972 we ordered that this action proceed as a class action on a tentative basis. Subsequently, notices were sent to 112 purported class members in accordance with Fed.R.Civ.P. 23(c)(2). Nineteen persons requested exclusion from the class. A proof of claim form was also mailed with the notice to the class, and proof of claims were filed on behalf of the 93 remaining persons. By Opinion and Order of March 30 and May 31, 1973, the tentative certification of a class made by the Order of June 27, 1972 was vacated in respect to all counts of the complaint other than that portion of Count III alleging fraud in the merger of IRI and Regal Crest and the Rule 10b–6 count (Count IV).

Two motions to intervene have since been filed on behalf of eighteen (18) persons. Of the eleven (11) persons seeking to intervene by the first motion filed on July 16, 1973, ten (10) had filed proof of claims pursuant to our Order of notice to the class on September 18, 1972. Of the seven (7) persons seeking to intervene by the second motion filed

on October 9, 1972, four (4) have previously filed proof of claims. It appears that four of the persons now seeking to intervene who have not filed proof of claims never received notice of the suit. Finally, it should be noted that one of the persons seeking to intervene pursuant to the July 6, 1973 motion, Mark S. Kravitz, had moved to intervene on December 27, 1971. Kravitz's motion to intervene at that time was denied by Order of June 27, 1972 when we allowed the action to proceed tentatively as a class action.

The parties have fully briefed the issues raised by the July 6, 1973 motion to intervene. By letter to the court defendant Fahnestock requests that we postpone "the necessity of defendants' answering [the October 9, 1973 motions to intervene] or filing any briefs in opposition thereto until such time as the motions presently before [the court] have been decided." We will deny this request. The two motions raise identical issues and there is no further need for briefs in respect to them. We will, therefore, consider both motions together at this time.

■ Our discussion of intervention which follows is relevant only with respect to the non-class action counts. Since the intervenors are represented by the same counsel who represents them in the only remaining class action claim involving the merger of IRI and Regal Crest (which is a portion of Count III), no further benefit would come to them by intervention with respect to the merger claim.[12] They are fully protected and equally bound in respect to the merger claim as members of the class as they would be as parties to the action.

■ Initially, we will deny the motions to intervene insofar as intervention is sought as a matter of right pursuant to Fed.R.Civ.P. 24(a)(2). The intervenors cannot claim a legally protected interest in the transaction involved in the case *sub judice*.[13] Old Colony Trust Co. v. Penrose Industries Corp., 387 F. 2d 939 (3d Cir.), cert. denied 392 U.S. 927, 88 S.Ct. 2283, 20 L.Ed.2d 1385 (1968). A determination by us on the non-class action claims concerning the existence of fraud or of material omissions in respect to the transaction of the plaintiffs in this case would not affect timely claims by persons who were subject to similar fraud or material omissions in completely different transactions. We must, therefore, deny the motion to intervene of right.

Permissive intervention pursuant to Fed.R.Civ.P. 24(b)(2) is allowed "where an applicant's claim or defense and the main action have a question of law or fact in common." And the court is directed in exercising its discretion to "consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties."

■ Fahnestock contends that the motions to intervene should be denied because the claims asserted are barred by the applicable statutes of limitations, there do not exist issues of common fact or law and intervention will unduly delay or prejudice the adjudication of the rights of the original parties. Reliance is placed on Philadelphia Electric Co. v. Anaconda American Brass Co., 43 F.R. D. 452 (D.D.Pa.1968) for the proposition that the filing of the class action suit on October 21, 1970 did not toll the applicable statute of limitations for the

---

12. We will treat the motions to intervene by the four persons who had not received notice of class action as evidencing notice and a desire not to opt out of the class established with respect to the Count III merger claim. We will direct that they are members of the class. Fed.R.Civ.P. 23(c)(3). See Frankel, Some Preliminary Observations Concerning Civil Rule 23, 43 F.R.D. 39, 46 (1968).

13. This is not true of the class action members in Count III. As we have stated, however, our discussion of intervention is limited to the non-class action counts.

purported class members who now seek to intervene. It is reasoned that since we held by our Opinion and Order of March 30, 1973 that this action could not proceed as a class suit under Fed.R. Civ.P. 23(b)(3) because common questions of law and fact did not predominate over questions affecting only individual members the statute of limitations has now run on the claims asserted by the intervenors.

The Supreme Court has recently dealt with the relationship of the statute of limitations and the provisions of Fed.R. Civ.P. 23. In American Pipe and Construction Co. v. Utah, 42 U.S.L.W. 4155 (1974) [414 U.S. 538, 94 S.Ct. 756, 38 L.Ed.2d 713] the Court considered the effect of the statute of limitations governing antitrust suits under §§ 4B and 5(b) of the Clayton Act, 15 U.S.C. §§ 15b and 16(b) on a determination that a class action did not exist because the numerosity requirement of Fed.R.Civ.P. 23(a)(1) did not exist. Section 5(b) of the Clayton Act tolls the four year statute of limitations provided for under § 4B "[w]henever any civil or criminal proceeding is instituted by the United States to prevent, restrain, or punish violations of any of the antitrust laws, . . . ." The statute of limitations with respect to any private right of action is suspended during the Government civil or criminal proceeding and for one year thereafter. The Government civil action in *American Pipe* ended in a consent decree on May 24, 1968. Utah brought suit 11 days short of a year later on May 13, 1969.

On December 4, 1969, well after the statute of limitations had run, the district court determined that the suit could not proceed as a class action because of the failure to satisfy the numerosity requirement. Eight days later on December 12, 1969, municipalities and water district, entities originally sought to be represented by Utah, moved to intervene under both Fed.R.Civ.P. 24 (a)(2) and 24(b)(2). The district court denied the motions because the claims asserted were held to be barred by §§ 4B and 5(b) of the Clayton Act and not tolled by the Utah class action suit. The Ninth Circuit reversed and the Supreme Court affirmed the Circuit decision.

After surveying the criticisms made of the pre-1966 rule governing class actions in which the class action suit operated merely as "an invitation to joinder" and the purported class members could decide whether to be bound by any decision on the merits based on developments at trial, the Court concluded that the present Rule 23 was no longer susceptible to such abuses and was "truly a representative suit." Given the representative nature of the suit it is inconsistent with Rule 23 to claim that a person seeking to join a class after the running of the statute of limitations is asserting a separate cause of action. The Court stated:

"[Whenever it has been] found that the named plaintiffs asserted claims that were 'typical of the claims or defenses of the class' and would 'fairly and adequately protect the interests of the class,' Rule 23(a)(3)(4), the claimed members of the class stood as parties to the suit until and unless they received notice thereof and chose not to continue. Thus, the commencement of the action satisfied the purpose of the limitation provision as to all those who might subsequently participate in the suit as well as for the named plaintiffs. To hold to the contrary would frustrate the principal function of a class suit, because then the sole means by which members of the class could assure their participation in the judgment if notice of the class suit did not reach them until after the running of the limitation period would be to file earlier individual motions to join or intervene as parties —precisely the multiplicity of activity which Rule 23 was designed to avoid in those cases where a class action is

found 'superior to other available methods for the fair and efficient adjudication of the controversy.' Rule 23(b)(3)."

42 U.S.L.W. 4159 [94 S.Ct. 765]. The result is the same even as to members who were not aware of the suit or who did not rely on the suit to protect their interests.

Furthermore, even though a class action has been denied for failure to satisfy the numerosity requirement, "the commencement of the original class action suit tolls the running of the statute for all purported members of the class who make timely motions to intervene after the court has found the suit inappropriate for class action status." 42 U.S.L.W. 4160 [94 S.Ct. 766]. And the Court continued:

"A contrary rule allowing participation only by those potential members of the class who had earlier filed motions to intervene in the suit would deprive Rule 23 class actions of the efficiency and economy of litigation which is a principal purpose of the procedure. Potential class members would be induced to file protective motions to intervene or to join in the event that a class was later found unsuitable. In cases such as this one, where the determination to disallow the class action was made upon considerations that may vary with such subtle factors as experience with prior similar litigation or the current status of a court's docket, a rule requiring successful anticipation of the determination of the viability of the class would breed needless duplication of motions. We are convinced that the rule most consistent with federal class action procedure must be that the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the action been permitted to continue as a class."

42 U.S.L.W. 4160 [94 S.Ct. 766] [footnote omitted].

The Court then went on to find that the tolling effect caused by Fed.R.Civ. P. 23 was not inconsistent with the reasons underpinning a statute of limitations. The commencement of a class action satisfies the need to prevent surprise to the defendant and fulfills the requirement of barring a plaintiff who has slept on his rights.

Finally, the Court found that there was nothing within the scheme of the antitrust laws which implied that the tolling of the specific statute of limitations provided by Congress was inconsistent with the antitrust laws.

There are, of course, a number of differences between the case before us and *American Pipe*. We denied class action status because we did not consider that the common questions of law or fact predominated over individual questions. Furthermore, we deal here with the securities laws. Also, we had originally permitted this case to proceed as a class action. These differences are, however, immaterial in light of the Court's reasoning in *American Pipe*.

The failure to give a tolling effect to the denial of a class action because common questions of law or fact do not predominate over questions involving individual members would produce the same effect the Court in *American Pipe* held Rule 23 was designed to avoid. A determination with respect to the "predominacy" of a question of law or fact oftentimes involves subtle analysis of the nature of the claim asserted by the class members necessitating a thorough understanding of the proof required at trial. This is particularly true in the securities field. The elements of reliance and materiality call forth different kinds of proof depending on the conduct alleged to have been engaged in by the defendants. *Compare* Affiliated Ute Citizens v. United States, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972)

*with* Landy v. Federal Deposit Insurance Corp., 486 F.2d 139 (3 Cir. filed July 30, 1973). The dependence on oral statements as evidence of the fraud undoubtedly effects the predominance of fact questions. When the plaintiff's claim relies on documentation, predominance is more easily established. In this kind of litigation a determination that the denial of the class action for lack of predominance does not toll the statute of limitations would surely prompt purported class members to file motions to intervene to protect their interests.

Furthermore, the legislative scheme provided by the securities laws would seem to favor tolling of the statute of limitations provided for in § 13 of the Securities Act of 1933, 15 U.S.C. § 77m and the incorporated state statutes of limitations governing fraud actions. The question of fraud has frequently been a reason to allow tolling of the statute of limitations. See Holmberg v. Armbrecht, 327 U.S. 392, 66 S.Ct. 582, 90 L.Ed. 743 (1946).

We conclude, therefore, that the applicable statutes of limitations involved in this suit were tolled by the filing of plaintiffs' complaint on October 21, 1970 and did not begin to run again until we vacated our Order designating a class on March 30, 1973. Under these circumstances the filing of the motions to intervene on October 9, 1973 would seem to be timely.

With respect to the merits of the motions to intervene under rule 24(b)(2), we consider it clear that the movants assert 'claims that are in common with those asserted by the plaintiffs. "The most obvious case for permissive intervention, of course, is the situation where the intervenor has a claim against the defendant similar to or identical with that asserted by the plaintiff." 3B Moore, Federal Practice, ¶ 24.10[2] at 24-357 (1974).

Granting the motions to intervene will undoubtedly cause delay in this already ancient case. While an appellate court might not consider it an abuse of discretion to deny these motions to intervene at a time so long after filing of the complaint, we think in fairness to the movants that their motions be granted. Unfortunately a number of years have now been spent over pretrial skirmishing involving the issues of class action status. Little discovery has taken place on the merits of plaintiffs' cause of action. We will order the parties to forthwith proceed to discovery and to trial within three months. The motions to intervene have not come while the parties were in the midst of discovery. We will, therefore, grant the motions to intervene, but will look unfavorably upon any further motions to intervene or any other motions which may cause any more delay.

### V. Consolidation of Actions.

A similar case as that before us was initially consolidated with this case. The Order consolidating that case, Theodoredis v. Regal Crest, C.A. 70-2764, with this case was vacated when we permitted this case to proceed as a class action. Since we perceive no prejudice to any of the parties in trying both cases together because we have only one remaining class action claim, we will again consolidate Theodoredis with this case. Theodoredis raises issues of common fact with Goldstein. Judicial economy will be served by trying these cases together.

Finally, an order will be entered shortly calling for expedited discovery in both these cases and setting a trial date in June of 1974.