Richard J. SENNOTT and Joan Sennott, Plaintiffs-Appellees,

v.

RODMAN & RENSHAW, Defendant-Appellant.

No. 71-1201.

United States Court of Appeals, Seventh Circuit.

Argued April 24, 1972.

Decided Jan. 18, 1973.

Rehearing En Banc Denied March 28, 1973.

Howard Lewis Fink, Robert Dunn Glick, Ira S. Kolb, Chicago, Ill., for defendant-appellant.

Patrick W. O'Brien, James W. Gladden, Jr., Chicago, Ill., for plaintiffs-appellees.

Before SWYGERT, Chief Judge, PELL, Circuit Judge, and LARAMORE, Senior Judge.*

PELL, Circuit Judge.

. Appellant Rodman & Renshaw, a securities brokerage house and member of the New York Stock Exchange, appeals from an adverse judgment in the district court awarding appellees Richard and Joan Sennott damages of $99,600 plus prejudgment interest. Appellant was found vicariously liable for the damage caused Sennott and his wife by the fraudulent securities manipulations of Jordan Rothbart, a former associate of Rodman & Renshaw and son of a partner in the firm. Judgments were also entered against Jordan Rothbart and his father, William Rothbart. Only Rodman & Renshaw (Rodman) appealed.

Jordan Rothbart, a commodities speculator and securities dealer apparently possessed of persuasive sales ability but a lesser standard of integrity, had at one time but not subsequent to 1958, been an employee of Rodman. No express authority to act on behalf of that firm existed subsequent to 1958; indeed it fairly appears that he was at the times here involved persona non grata to

* Senior Judge Don N. Laramore is sitting by designation from the United States Court of Claims.

Rodman notwithstanding his father's status as a partner therein. In 1962, the Securities and Exchange Commission in an order had held that Jordan had between 1955 and 1957, while employed by another broker-dealer, violated certain anti-fraud provisions of the Securities Act. In 1958, his registration as a representative of a member of the National Association of Securities Dealers, Inc. had been revoked because of deceptive practices in the sale of securities. The Sennotts were unacquainted with this background at any material time here involved.

Jordan became a member of the Chicago Board of Trade in 1960 and engaged thereafter as a trader for his own account in commodities. Through his dealings at the Board of Trade, Jordan became acquainted with Richard Sennott who was also an active trader. Sennott traded both for himself and for the Honeymead Trading Corporation of which he was an officer.

As their relationship developed, Sennott, a more experienced commodities trader, recommended various transactions to Jordan who reciprocated by encouraging Sennott to take advantage of Jordan's father's expertise in the securities market. Specifically, Jordan told Sennott that his father had made money in the stock market for several members of the Board of Trade and that if Sennott ever wished to open a stock trading account Jordan would have one opened for him at Rodman & Renshaw. Initially Sennott declined to act on Jordan's recommendations, but in January 1964, in response to Jordan's assertion that his father thought a particular stock was a good buy, Sennott asked Jordan to purchase a limited number of shares for him. Jordan immediately went to the special Rodman telephone located on the floor of the Board of Trade and arranged for the purchase of Sennott's order through Rodman.

In the same month Jordan arranged for Sennott to open a trading account with Rodman in the name of his, Sennott's, wife. Trading through that account and six others which he subsequently opened, Sennott's trading volume with Rodman for the two-year period between 1964 and 1966 totalled more than $2,000,000. Approximately seventy per cent of this trading was done through accounts opened by Jordan Rothbart, and much of it was done on the recommendation of Jordan or his father. A typical transaction involved Jordan advising Sennott that his father believed a particular stock should be bought or sold, Sennott indicating a desire to purchase, and Jordan going to the Rodman phone on the Board of Trade floor and calling in the order. Shortly thereafter Sennott would receive a mailed confirmation slip from Rodman.[1] Sennott, of course, paid brokerage fees on all of these transactions.

In February, 1964, Jordan and Sennott had a conversation on the floor of the Board of Trade during which Jordan told him that Skyline Homes, Inc. (Skyline) was about to be listed on the New York Stock Exchange but that the company needed more shares to be eligible. In an effort to meet the requirement, Skyline stock was made a secondary offering through Rodman & Renshaw at approximately $40 per share. Jordan's offer to procure a portion of this offering for Sennott was accepted, and it was agreed that Jordan would place an order with Rodman for 2,000 shares of Skyline. Sennott received the shares in April and went immediately to the offices of Rodman & Renshaw to deliver a check for the shares. It was on this occasion that Sennott first met William Rothbart.

---

1. The district court made the additional finding that Jordan Rothbart solicited orders for Rodman & Renshaw from at least five other members of the Board of Trade. These orders and sales were accomplished by the use of the Rodman telephone, and in each instance the member placing the order dealt exclusively with Jordan Rothbart.

While there was nothing fraudulent or improper about this or the previous sales, it was the precursor for the deception which followed. In March 1964, shortly after the order for 2,000 shares of Skyline was placed but before Sennott met William Rothbart, Jordan approached Sennott with respect to the purchase of additional shares of Skyline stock, this time through stock options which allegedly had been made available to Jordan through his father's dealings with Skyline. The district court's Finding of Fact Number 9 correctly sets forth the representations made by Jordan Rothbart:

". . . Rothbart told Sennott that a number of options for the purchase of Skyline Homes, Inc. stock had been made available to him, that the options had initially been offered to his father William Rothbart, a partner in Rodman & Renshaw, in return for services his father had rendered Skyline Homes, Inc. in the secondary public offering referred to above and also for helping Skyline Homes, Inc. become listed on the American Stock Exchange, but that, when Rothbart's father turned down the offer because SEC regulations forbid such transactions on the part of broker-dealers, the options had been made available to him. Jordan Rothbart said that he was willing to exercise some of the options on behalf of Sennott. Jordan Rothbart also told Sennott that he was going to exercise some of the options for himself and that all the money for the options would be held in escrow in New York City until the time came for the exercise of the option rights. He told Sennott that the options would be exercised for shares of Skyline Homes, Inc. stock within seven months and that he would then deliver shares of said stock to Sennott at a price of $26.50 per share."

At the time these representations were made, Skyline was selling for approximately $40 per share. Lured by a dis-count of that magnitude, Sennott agreed to purchase Skyline stock through the option plan. On seven separate occasions between March 18 and October 2, 1964, Sennott placed orders and delivered checks to Jordan Rothbart for Skyline stock at the option price. Payments for these orders totalled approximately $142,000.[2] No stock options of the type described by Jordan ever existed and the representations were obviously designed to defraud Sennott. Instead of depositing the payments in an escrow account in New York, Jordan placed each check in his wife's personal checking account at the First National Bank of Highland Park and subsequently used the money to pay his own substantial trading losses.

When Jordan Rothbart first proposed the purchase of Skyline stock through the option arrangement, it was agreed that neither party would divulge the nature of their dealings. In accordance with that agreement each of the seven payments was recorded only by handwritten cash receipts prepared by Sennott and signed by Jordan Rothbart.

When the stock which had been set for delivery on October 18, 1964, did not materialize, Sennott inquired as to the reason for the delay. He was told by Jordan that there was no reason for concern, that the temporary delay was caused by the S.E.C.'s refusal to list Skyline on the New York Stock Exchange until the company had more shareholders. Satisfied with this explanation and with Jordan's assurance that the stock would be forthcoming soon, Sennott took no further action with respect to the Skyline options until early November 1964 when he was summoned to a meeting with the managing partner of Rodman & Renshaw, Vernon Carroll.

The circumstances of this meeting warrant detailed scrutiny. In October or early November, Jordan Rothbart approached Sennott on the floor of the Board of Trade and asked him to accom-

---

2. $10,000 of the amount was paid by Honeymead and is not involved in this appeal.

pany him to a public phone to speak with William Rothbart. In the course of their conversation, William Rothbart told Sennott that Mr. Carroll wanted to meet with him to discuss the Skyline options but that the matters which Mr. Carroll wished to discuss were none of his business. Sennott was then advised not to cooperate with Carroll. Accompanied by Jordan, Sennott went to the offices of Rodman & Renshaw that afternoon to meet with Carroll. Jordan's father met them at the door and again told Sennott the option transactions were none of Carroll's business. At this time, he also added that Sennott should not worry, he would get his stock options. All three men then went to Carroll's office where Carroll produced several of the checks Sennott had given Jordan Rothbart for the options. Carroll then sought to question Sennott with respect to how the checks happened to have been endorsed by Dolores Rothbart (Jordan's wife) and deposited in her account in the First National Bank of Highland Park. Sennott, while admittedly shocked by this revelation, told Carroll it was none of his business and refused to disclose the nature of his dealings with Jordan. Immediately after the conference, Sennott asked Jordan Rothbart about the checks and was told that they were deposited in the Rothbart account so Jordan, who asserted he was purchasing equal amounts of Skyline stock, could pay for the total stock purchase with a single check. Apparently this explanation satisfied Sennott since he made no further inquiries on the matter. Indeed, when again summoned to Car-

roll's office a few weeks later, he voluntarily signed a letter of indemnity protecting Rodman & Renshaw from liability for any failure on their part to investigate fully the signatures on the checks.

However, when several months had passed without delivery, Sennott again pressed Jordan for an explanation. On February 26, 1965, as a result of this inquiry, Jordan delivered 1,000 shares of Skyline common stock in street name to Sennott. This stock was purchased through Jordan's own broker, not Rodman & Renshaw, on the open market and merely signed over to Sennott in an effort to deceive him into believing he was receiving part of his "stock options." The deception was effective for, although Sennott continued his requests for the balance of the stock, he made no further inquiry into the actual facts surrounding the late options.

Between February 26, 1965, and January 20, 1966, Jordan delivered an additional 2,200 shares of Skyline common stock to Sennott. Delivery of this stock was made in six installments. As before, each delivery consisted of stock purchased on the open market for the market price. As set forth in detail below, the value of the shares at the time received totalled $82,600.[3]

In the spring of 1966, Sennott, who apparently had been oblivious to the waving banners of suspect practices of which he was the victim, learned that another member of the Board of Trade had filed a $75,000 claim against Jordan Rothbart with the Board of Directors alleging a fraudulent scheme remarkably similar to the circumstances of Sennott's

3.

| Date | Number of Shares | Closing Price | Amounts Received by Sennott |
|---|---|---|---|
| 2/26/65 | 1,000 | $27.25 | $27,250.00 |
| 3/ 3/65 | 600 | 27.625 | 16,575.00 |
| 5/ 4/65 | 200 | 29.50 | 5,900.00 |
| 8/ 3/65 | 400 | 24.375 | 9,750.00 |
| 8/ 5/65 | 300 | 24.00 | 7,200.00 |
| 12/13/65 | 200 | 22.75 | 4,550.00 |
| 1/20/66 | 500 | 22.75 | 11,375.00 |
| | 3,200 | | $82,600.00 |

own transactions with Jordan. At approximately the same time, Sennott also learned that Jordan Rothbart had previously been expelled from the securities market. Until that time, Sennott had been unaware of Jordan's prior fraudulent practices or his dismissal from Rodman. In spite of these revelations, however, Sennott clung to the hope that the stock would be delivered, and, in an effort to facilitate that vain hope, when summoned before the Business Conduct Committee investigating Jordan Rothbart, he refused to cooperate or disclose his dealings. Indeed, not until May 1966, after numerous delivery dates had passed without receipt of further shares of stock, did Sennott go to William Rothbart to inquire about the stock options. Sennott described his meeting with William Rothbart at the Rodman office. "I let Bill know exactly what was going on as far as no delivery of the Skyline Homes, that he [Jordan] was probably going to be expelled from the Chicago Board of Trade, at which time Bill Rothbart told me there was nothing he could do about it."

Jordan was expelled from the Board of Trade in June 1966 for refusing to turn his financial records over to the Business Conduct Committee. At that point he ceased coming to the floor of the Board of Trade and Sennott discontinued his unsuccessful efforts to procure delivery of the stock by telephone. Only after all else had failed did Sennott approach Rodman with evidence of the scheme.

At the conclusion of a bench trial on the merits, the trial judge found Rodman vicariously liable for the losses caused the Sennotts. Liability was based upon several theories set forth in the court's conclusions of law. First, the court concluded that William Rothbart "knowingly assisted and participated in the efforts of Jordan Rothbart to defraud plaintiffs," in violation of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 adopted by the Securities and Exchange Commission thereunder, Section 9(a)(4) of the Securities Exchange Act of 1934, and Section 17(a) of the Securities Act of 1933. The court then held that not only William Rothbart's knowledge of the solicitation of stock business by Jordan at the Board of Trade but also his knowledge of the false representations to Sennott regarding Skyline was acquired within the scope of the Rodman partnership business and therefore was imputed to and binding upon Rodman. In addition, the judge concluded that because Rodman "knew or should have known" of the illegal conduct of William and Jordan Rothbart, it was equally liable with them for the false representations. The trial judge also held Rodman accountable for Jordan Rothbart's action because it "aided and abetted" in the fraud in that, in breach of its broker-agent fiduciary duty, it failed to inform Sennott of Jordan's background. Finally, the trial court imposed liability on Rodman on the ground that Rodman failed to act in good faith with respect to its duties as a "controlling person" over William and Jordan Rothbart, Section 20(a) of the 1934 Act, 15 U.S.C. § 78t(a).

The ground rules for our review are well-established and need not be repeated here. The applicable standards are collected and summarizd by Judge Hastings in Prince v. Packer Manufacturing Company, 419 F.2d 34, 36–37 (7th Cir. 1969). Assigning the matter of credibility to the district court we turn therefore to a determination of whether there is substantial evidence to support the findings of fact and whether the court erred as to the applicable law.

■ Taking the agency questions first, it is clear that Rodman must be deemed to have had knowledge of all of the securities transactions which Jordan solicited for his father prior to the inception of the fraudulent stock option scheme. In that situation, the knowledge of William Rothbart is, under general principles of agency, imputed to the partnership. Had plaintiff been defrauded in one of those transactions, Rodman's liability would seem to be

unquestionable. Those transactions, however, do not comprise the substance of this lawsuit. On the contrary, the facts upon which liability must be established in this case, if at all, are critically different. While the evidence leaves no doubt that William Rothbart, having processed the orders and his firm having received a broker's fee, had knowledge of the solicitations of Jordan in the prior transactions, the record is silent as to a basis upon which the district court could properly have inferred that William had knowledge at any pertinent time of his son's stock option deception.

We are at a loss as to the basis in the record for the district court's conclusion that William Rothbart "knowingly assisted and participated" in the fraud. Indeed, the first contact the plaintiff had with William respecting the options took place in November 1964, after all of the payments for the stock had been made. This is not a pertinent time. There is no evidence that prior to the Carroll meeting William Rothbart did anything to induce Sennott to subject himself to Jordan's defalcations, nor that he had any knowledge of what was transpiring until after the fact.

Further, we find no reason to belive that Sennott considered William Rothbart to be any part of the transaction other than that he had been the original offeree of the mythical options. In fact, Sennott himself indicated that his understanding of Jordan's stricture of confidentiality to be he should not say a word about the transaction to anybody including William Rothbart. Sennott also testified that it was never his understanding that the option shares were coming from or through Rodman but he imagined they would be coming from the Skyline corporation itself. Finally, Sennott admitted on cross-examination that he had testified in his deposition that when asked by investigators for the Illinois Securities Commission, which was looking into his complaint against Jordan, whether William Rothbart had ever participated or conspired with Jordan to perpetrate the option fraud, he had replied, "[N]o, not to my knowledge." [4]

Citing Crittendon v. State Oil Company, 78 Ill.App.2d 112, 115, 222 N.E.2d 561, 563–564 (1966), Sennott contends on this appeal that Rodman & Renshaw is estopped by its conduct from claiming that Jordan was not its representative. Again, we do not disagree as to the transactions handled through that firm, but those are not the ones with which we are now concerned. Sennott also speaks of "apparent agency" established by Rodman. Without becoming involved in the semantic niceties of distinctions, if any, between ostensible agency, apparent agency, and agency by estoppel, we note that Crittendon (78 Ill.App.2d at 116, 222 N.E.2d at 564) states that "[i]t is essential to the application of the doctrine of estoppel that such conduct or representations be relied and acted upon . . . ."

Under Sennott's theory of apparent authority or estoppel, therefore, plaintiff would be required to prove that he was relying upon Jordan's apparent authority, and hence on Rodman, when he decided to purchase the Skyline options. Reliance is not evident from the record before us. Indeed, the converse is clearly demonstrated, for not only did the

---

4. This would seem consistent with Sennott's description of his May 1966 meeting with William Rothbart at which he "let Bill know exactly what was going on as far as no delivery of the Skyline Homes. . . ." When questioned about that meeting, Sennott stated in deposition:

"And at this particular time is when I said, 'Well, you know, Bill, whether you realize it or not, it was supposedly offered to you and that because you were a senior partner in Rodman & Renshaw, Jordie told me, under the SEC rules you couldn't accept it.'

"He said, 'Well, that's not true.' He said, 'I knew nothing of the stock options in Skyline.'

"And again I asked him, 'Why did you tell me before going to Carroll's office not to worry? I'd get my stock options in Skyline.'

"He said, 'Because Jordie had assured me that you would.'"

fraudulent representations never involve Rodman but both Sennott and Jordan Rothbart actively sought to prevent Rodman from discovering the option transactions. Sennott agreed to keep the option plan secret, including from Rodman, and intentionally used personal payment receipts to record Sennott's payments. The strongest evidence of the plaintiffs' lack of reliance upon Rodman, however, is seen in Sennott's refusal to cooperate with Carroll's inquiry into the endorsements on Sennott's checks. Had Sennott been relying on Rodman's participation in the option plan, it is unlikely that he would have refused even to discuss the matter with a representative of Rodman. On the contrary, Sennott's own statements belie such reliance. Responding to an inquiry by defendant's attorney, Sennott observed, "[W]ith regard to this money that had been invested, I really felt that this thing would have completely gone undetected by Rodman & Renshaw had not that check been made out of the profit sharing."

The Sennotts also place considerable reliance on Blackburn v. Dean Witter, 201 Cal.App.2d 518, 19 Cal.Rptr. 842 (5th Dist.Ct.App.1962), a case which they assert is "squarely in point." There, a registered representative of the defendant brokerage house persuaded the plaintiff to invest in stock of a non-existent company. The plaintiff then, as Sennott did here, sold some stock through the brokerage house to finance the purchase of the nonexistent stock. The brokerage house was subsequently found liable for the fraudulent acts of its representative. While *Blackburn* is factually similar to this case, a major distinction exists. The plaintiff in the *Blackburn* case was a customer who believed that he was purchasing stock through the brokerage house in the same manner as he had previously made purchases, and, as such, was relying on the expertise and integrity of the brokerage. Both the agency and the reliance elements were unquestionably present. Here, however, while some type of implied agency may well have existed as to

other transactions, there was no reliance upon this agency in the transactions in question. Simply stated, the damage Jordan Rothbart inflicted upon the plaintiffs was a result of Sennott's misplaced reliance upon Jordan Rothbart and not upon Rodman & Renshaw.

■ Having reviewed the record at length and found that the evidence supports neither plaintiffs' theory that William Rothbart had knowledge of his son's reprehensible scheme which was imputable to Rodman nor their theory of apparent authority, we are forced to reject the trial court's factual findings and legal conclusions with respect to these issues.

■ Our findings on these issues are also dispositive of plaintiffs' other theories of liability. As to their position that Rodman was guilty of "aiding and abetting" in the option scheme, our conclusion that the evidence does not support the trial judge's finding that William Rothbart had knowledge of the fraudulent scheme precludes imposition of liability on this basis. Without a showing that a Rodman partner or agent had knowledge of the fraudulent acts, and in the absence of a showing that here Jordan was purporting to act for Rodman, there is no basis for holding Rodman liable for acts of third parties.

■ Similarly, plaintiffs' theory and the trial court's finding that Rodman is liable under Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a) as a "controlling person" over William and Jordan Rothbart is without merit. The trial judge found that Rodman was in a position to control both men and that the partnership "did not act in good faith in exercising such control." That finding, while sufficient to impose liability on Rodman for any of the pre-option scheme stock solicitations in which Sennott actually relied upon Rodman's involvement in deciding whether to act, is not an adequate foundation upon which to base liability where Rodman was admittedly not considered to be involved in the transaction.

Rodman's duty to control its partners and agents, as well as its past employees, in situations such as this extends only to transactions with or by these parties where Rodman is itself involved. To extend it further would be to impose liability upon Rodman for virtually any act of its past or present employees and partners regardless of how remote and unrelated that act might be to Rodman & Renshaw. We are not inclined to read Section 78t so expansively.[5]

For these reasons the judgment below is reversed as to Rodman & Renshaw, and the cause is remanded with instructions to dismiss the complaint as to Rodman & Renshaw and to enter judgment for said defendant.

Reversed and remanded.

---

5. In addition, Section 78t governing the liabilities of "controlling persons" provides in part:

"(a) Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action."

Liability is not imposed where the controlling person exercises good faith or does not induce the act which gives rise to the cause of action. Here, Rodman may not have acted in good faith with respect to the legitimate stock solicitation by Jordan Rothbart of which William Rothbart had knowledge but Rodman's lack of knowledge of the fraudulent stock option scheme creates an entirely different situation. We do not see how Rodman can be found to have exercised bad faith with respect to a transaction of which it had no knowledge. It is equally clear that Rodman did not "induce" the acts of Jordan Rothbart, and without bad faith or inducement there can be no liability under this section.