**Hudson T. HARRISON and Harrison Construction Incorporated, a corporation, Plaintiffs–Appellants, Cross–Appellees,**

v.

**DEAN WITTER REYNOLDS, INCORPORATED, a corporation, Defendant–Appellee, Cross–Appellant.**

**Nos. 91–1458, 91–1592.**

United States Court of Appeals, Seventh Circuit.

Argued Feb. 10, 1992.

Decided Sept. 8, 1992.

As Amended Oct. 13 and Oct. 20, 1992.

Thomas P. Ward (argued), McBride, Baker & Coles, Chicago, Ill., for plaintiffs.

Paul B. Uhlenhop (argued) and Charles J. Risch, Lawrence, Kamin, Saunders & Uhlenhop, Chicago, Ill., for defendant.

Before KANNE, Circuit Judge, WOOD, Jr., Senior Circuit Judge, and SHARP, District Judge.[*]

HARLINGTON WOOD, Jr., Senior Circuit Judge.

For nearly eighteen months Hudson T. Harrison, an Illinois resident, sent his and his company's money to a Dean Witter Reynolds, Inc. ("Dean Witter") account executive and vice president, John G. Kenning, in Boca Raton, Florida, for investment in low-risk municipal bonds. Both Kenning and his assistant, John M. Carpenter, offered Harrison an opportunity he could not resist: If he sent money to them personally, they would place it in Carpenter's personal, employee account at Dean Witter and then invest it in a specially available, municipal-bond fund. This misuse of the employee account would yield Harrison a significantly increased return because the bonds would be purchased at Dean Witter's cost and at the reduced commission allowed on employees' own transactions. Dean Witter's rules prohibited using employee accounts in this manner.

All told, Mr. Harrison and his company, Harrison Construction Inc. (collectively "Harrison"), the plaintiffs-appellants here, invested roughly $4 million. A few payments, or investments, were made by wire transfer to Carpenter's personal checking account, but most were made by check, mailed to Carpenter's home. In return Harrison received personal, promissory

[*] The Honorable Allen Sharp, Chief Judge, United States District Court for the Northern District of Indiana, sitting by designation.

notes signed initially by Carpenter and later by both Kenning and Carpenter. These notes offered annualized interest rates of approximately 18% to 60%. Dean Witter points out, however, that Harrison received two notes for each transaction: one accurately stated his anticipated return, and the other, which he used for income-tax purposes, materially understated it.

The scheme, however, was a fraud perpetrated by Kenning and Carpenter, who invested not in municipal bonds but in much riskier put options. These investments went sour. Harrison and roughly 125 other investors lost most of their money. Kenning and Carpenter were later sentenced to eight and four years' incarceration, respectively, in a federal penitentiary for their criminal acts and ordered to pay $8 million restitution.

Harrison sued not only Kenning and Carpenter but also Dean Witter, seeking to impose both vicarious and direct liability. He raised claims under Section 10(b) of the Securities Exchange Act of 1934 (the "1934 Act"), 15 U.S.C. § 78j(b); Section 20(a) of the 1934 Act, 15 U.S.C. § 70t(a); the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 *et seq.;* state common law; and one state statute. One of the RICO claims was dismissed early on. *Harrison v. Dean Witter Reynolds, Inc.,* 695 F.Supp. 959 (N.D.Ill. 1988). The other claims succumbed to Dean Witter's motion for summary judgment. *Harrison v. Dean Witter Reynolds, Inc.,* 715 F.Supp. 1425 (N.D.Ill.1989). The case was then transferred from Judge Duff to Judge Lindberg, who imposed sanctions under Fed.R.Civ.P. 11 on Harrison's attorney, Thomas P. Ward, for raising two frivolous claims. *Harrison v. Dean Witter Reynolds, Inc.,* 132 F.R.D. 184 (N.D.Ill. 1990). These Rule 11 sanctions resulted in an award of attorney's fees in the amount of $20,860.50. *Harrison v. Dean Witter Reynolds, Inc.,* No. 86 C 8003, Memorandum Opinion and Order, 1990 WL 165638 (N.D.Ill. Oct. 19, 1990). Kenning and Carpenter were then dismissed on Harrison's motion under Fed.R.Civ.P. 41(a), and final judgment was entered February 6, 1991. Harrison appeals the grant of summary judgment in favor of Dean Witter and the imposition of sanctions; Dean Witter appeals the partial denial of sanctions. For the reasons stated below we affirm in part and reverse in part.

## ANALYSIS

Diversity jurisdiction exists over the state-law claims. Plaintiff, Hudson T. Harrison, is a citizen of Illinois. Plaintiff, Harrison Construction, Inc., is an Illinois corporation with its principal place of business in Illinois. The defendant, Dean Witter, is a Delaware corporation with its principal place of business in New York. The former defendants, Kenning and Carpenter, were citizens of Florida. The amount in controversy exceeds $50,000. 28 U.S.C. § 1332. We reserve for the moment Dean Witter's contention that we do not have jurisdiction over the appeal with respect to the Rule 11 sanctions imposed.

We review *de novo* a district court's decision to grant summary judgment, viewing the facts in a light most favorable to the nonmoving party. *Prince v. Zazove,* 959 F.2d 1395, 1398 (7th Cir.1992); *Ooley v. Schwitzer Division, Household Manufacturing Inc.,* 961 F.2d 1293, 1297 (7th Cir. 1992). "The movant has the burden of showing that there is no genuine issue of fact, but ... [under Fed.R.Civ.P. 56(e) the nonmoving party] must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). Where a party who bears the burden of proof fails to establish an essential element in its case, "there can be 'no genuine issue as to any material fact' ... [and] all other facts [become] immaterial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–33, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986) (quoting Fed. R.Civ.P. 56(c)). *See also Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986).

SECTION 20(a)[1]

The district court based its grant of summary judgment on the proposition of law

---

**1.** Section 20(a) of the 1934 Act establishes liability as follows:

that under Section 20(a) of the 1934 Act the plaintiff must show "the defendant exercised some control over the wrongdoer with respect to the wrongful acts." *Harrison v. Dean Witter Reynolds, Inc.*, 715 F.Supp. 1425, 1436 (N.D.Ill.1989) (citing *Christoffel v. E.F. Hutton & Co.*, 588 F.2d 665, 668 (9th Cir.1978)). This is known as the "culpable participant" requirement or test. *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1574–75 (9th Cir.1990) (en banc), *cert. denied*, —— U.S. ——, 111 S.Ct. 1621, 113 L.Ed.2d 719 (1991); *Schlifke v. Seafirst Corp.*, 866 F.2d 935, 949 (7th Cir.1989). The court then found, as a matter of law:

> Dean Witter exercised no control over Kenning and Carpenter with respect to their sales of promissory notes [(the allegedly fraudulent acts)]. It did not know of these sales, nor could it have known of them, since Carpenter and Kenning structured their arrangement with Harrison to ensure that Harrison would not send any money to them at the office. Further, the sales were conducted in the names of Kenning and Carpenter alone; the payments on the notes were by Carpenter's personal checks; and Harrison never contacted Dean Witter to inquire about his investments.

*Harrison*, 715 F.Supp. at 1437.

In applying the culpable-participant test from *Christoffel*, the district court used a test we have never approved, a test, the rigors of which contravene our prior holdings, and a test expressly overruled, en banc, by the Court of Appeals for the Ninth Circuit in *Hollinger*, 914 F.2d at 1575.

In *Schlifke* we stated,

> This circuit has not crystallized the test for determining when liability may be imposed on a "controlling person," yet in *Barker* we stated that "the ability to persuade and give counsel is not the same thing as 'control', which almost always means the practical ability to *direct*

the actions of the people who issue or sell the securities."

*Schlifke*, 866 F.2d at 949 (citing *Barker v. Henderson, Franklin, Starnes & Holt*, 797 F.2d 490, 494 (7th Cir.1986); emphasis in *Barker*). We then stated, "We need not decide whether to adopt this more rigorous[, 'culpable-participation'] formulation for the [defendant] Bank was not a 'controlling person' even under the less demanding *Metge* test." *Schlifke*, 866 F.2d at 949. In *Metge v. Baehler*, 762 F.2d 621 (8th Cir.1985), *cert. denied*, 474 U.S. 1057, 106 S.Ct. 798, 88 L.Ed.2d 774; 474 U.S. 1072, 106 S.Ct. 832, 88 L.Ed.2d 804 (1986), the court had held:

> [P]laintiffs must establish, first, that the defendant lender actually participated in (*i.e., exercised* control over) the operations of the corporation *in general;* then he must prove that the defendant possessed the power to control the specific transaction or activity upon which the primary violation is predicated, but he *need not prove that this later power was exercised.* [Quotation marks and citation omitted.] We approve this test because it complies with precedents which counsel broad remedial construction of the statute and because it complies with precedents that distinguish between actual exercise of control in the violator's principal affairs and potential control over the violation.

*Metge*, 762 F.2d at 631 (first emphasis in original, others added).

While the *Schlifke* court clearly did not adopt the culpable-participation test, neither did it expressly adopt the two-pronged *Metge* test. The court did state, however, it agreed "fully with the district court's analysis," which utilized the *Metge* test. *Id.* at 949. Significantly, the control-person test approved in *Metge* was that used by the district court in *Metge v. Baehler*, 577 F.Supp. 810, 817–18 (S.D. Iowa 1984), which in turn applied elements stated in

Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom

such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t.

*Stern v. American Bankshares Corp.,* 429 F.Supp. 818 (E.D.Wis.1977).

> There is no requirement that the controlling person exercise control over the particular transaction which gives rise to the violation....
>
>   ....
>
> What the plaintiff in this action must establish is that those persons whom he contends are controlling persons have actively participated in the operations of [defendant] Bankshares and possessed actual control over the transaction in question. Once that is established the matters of knowledge and actual participation, which directly or indirectly induced the fraud, are matters for the defense.

*Stern,* 429 F.Supp. at 823–24 (citations omitted). Moreover, the *Metge* test comports with the definition of "control" promulgated by the Securities and Exchange Commission ("SEC")[2] and, as we shall now see, with our prior holdings, which also counsel broad remedial construction of the statute and recognition of a practical ability to direct the actions of those involved.

In *SEC v. First Securities Co. of Chicago,* 463 F.2d 981 (7th Cir.), *cert. denied,* 409 U.S. 880, 93 S.Ct. 85, 34 L.Ed.2d 134 (1972) (*"First Securities I"*), and a companion case, *SEC v. First Securities Co. of Chicago,* 466 F.2d 1035 (7th Cir.), *cert. denied,* 409 U.S. 1041, 93 S.Ct. 528, 34 L.Ed.2d 491 (1972) (*"First Securities II"*), we reversed the district court, which had disallowed a number of liability claims brought under Section 20(a). Leston B. Nay, president of First Securities and owner of 92% of its stock, had defrauded at least sixteen clients by inducing them to invest in spurious, high-interest, escrow accounts that, upon his suicide, June 4, 1968, were worthless. Typically, an investor would sell already owned securities through First Security; First Security would collect a commission on the sale and forward the remainder to the investor, who then would draw a personal check payable to Nay or to a bank

for his account. Nay issued receipts that took the form of a purported agreement or promissory note from him. Erratically, Nay made what appeared to be interest payments to the investors by personal check in envelopes on which First Securities' name and address appeared. In *First Securities I,* 463 F.2d at 985, the court observed,

> Finally, it is clear that Nay had no actual authority to act for First Securities with regard to the escrow account. It is also clear that First Securities' employees (other than Nay) knew nothing of the nature of the escrow nor, except for his secretary, even of its existence. Nay had forbidden anyone other than himself to open mail addressed to him....

The court concluded that it "had no doubt Nay, being the employee of First Securities as its president, was 'controlled' by First Securities within the intendment of section 20(a)." *Id.* at 987 (citation omitted). Moreover,

> First Securities made Nay its president, provided him with the trappings of a successful investment counsellor, held him out as providing such counsel, and then wilfully allowed Nay's enforcement of a rule regarding the opening of mail which was antithetical to the prevention of frauds of the type which occurred.

*Id.* at 988. After quoting this statement, the *First Securities II* court added, "First Securities also provided Nay with the printed letterheads, printed safekeeping receipts, rubber stamps and other supplies and accoutrements which enabled him to perpetrate and perpetuate his frauds." *First Securities II,* 466 F.2d at 1040.

In *Sennott v. Rodman & Renshaw,* 474 F.2d 32 (7th Cir.), *cert. denied,* 414 U.S. 926, 94 S.Ct. 224, 38 L.Ed.2d 160 (1973), we reversed a district court's finding of brokerage-house liability where no one at the brokerage itself had participated in the fraudulent acts. The actual fraud was committed by Jordan Rothbart some six

---

**2.** "The term 'control' (including the terms 'controlling,' 'controlled by' and 'under common control with') means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 240.12b–2.

years after he left the brokerage firm of Rodman & Renshaw. He became a commodities trader and member of the Chicago Board of Trade, where he met the plaintiff, Sennott, to whom he purported to sell $142,000 in stock options which, it turned out, never existed. The court found, however, that Rothbart's other transactions with Sennott, had they been fraudulent, would have imposed liability on Rodman & Renshaw under Section 20(a). As described by the court,

> A typical [non-fraudulent] transaction involved Jordan [Rothbart] advising Sennott that his father[, William, a registered representative of Rodman & Renshaw,] believed a particular stock should be bought or sold, Sennott indicating a desire to purchase, and Jordan going to the Rodman phone on the Board of Trade floor and calling in the order. Shortly thereafter Sennott would receive a mailed confirmation slip from Rodman. Sennott, of course, paid brokerage fees on all of these transactions.

*Sennott*, 474 F.2d at 34 (footnote omitted). The court concluded that while Rodman & Renshaw could be held liable under Section 20(a) for the just-described transactions, there was

> not an adequate foundation upon which to base liability where Rodman was admittedly not considered to be involved in the transaction. Rodman's duty to control its partners and agents, as well as its past employees, in situations such as this extends only to transactions with or by these parties where Rodman is itself involved.

*Id.* at 39–40.

In *Henricksen v. Henricksen*, 640 F.2d 880 (7th Cir.), *cert. denied*, 454 U.S. 1097, 102 S.Ct. 669, 70 L.Ed.2d 637 (1981), we reversed a district court's finding that a brokerage firm, Smith Barney, was liable under Section 20(a) for the fraudulently garnered commissions and margin expenses but not for the conversions by its salesman-agent, George Henricksen. We held Smith Barney was liable for the conversions, too.

Having entrusted her investment to Smith Barney's management through George [Henricksen], their agent, Wendee [Henricksen, George's former wife,] was entitled to rely on Smith Barney's fiduciary obligation to manage the investments in accordance with her recorded investment objectives and George's best professional judgment subject to the review and ultimate control of Smith Barney's supervisory personnel.

*Henricksen*, 640 F.2d at 888.

Lastly, we have affirmed a finding by the Commodity Futures Trading Commission that a commodity brokerage firm, Rosenthal & Company, was liable under Section 2(a) of the Commodity Exchange Act for the fraudulent acts of a non-employee who was, nevertheless, a manager, associate, and registered representative of the firm. 7 U.S.C. § 4; *Rosenthal & Company v. Commodity Futures Trading Commission*, 802 F.2d 963 (7th Cir.1986). Of particular relevance for us is the observation in *Rosenthal* that, although we affirmed the Commission's finding of liability, we could have, with equal justification, affirmed a finding that Rosenthal was not liable.

> [W]e don't suppose that we or any other court would think the Commission had taken leave of its senses [had it accepted Rosenthal's line of argument]. But we also think the Commission was entitled, without being deemed to have acted unreasonably or without substantial evidence, to conclude that [co-defendant] Pinckney was acting within the scope of his agency [with Rosenthal].

*Id.* at 968. The issue was factual, and it was the fact-finder's choice to find liability or not.

Those cases in which we have found control wanting help define the boundaries of "control person." In *Barker v. Henderson, Franklin, Starnes & Holt*, 797 F.2d 490 (7th Cir.1986), we affirmed that neither the law firm which had provided legal advice nor the accounting firm which had furnished accounting services with regard to certain bonds were control persons. Neither firm had the ability to control the

bond issuer; both firms had only the "ability to persuade and give counsel[, which] ... is not the same thing as 'control.'" *Id.* at 494. Neither firm had the authority to direct the actions of the bond issuer; additionally, neither had received the selling materials until after they were issued. *Id.* In *Sennott* there was no liability because there was no person which the brokerage firm could control; the fraud involved no member or representative of the firm. Rather, it was the non-fraudulent transactions which could have brought liability to the firm; one of its members did participate in the transactions, and the firm, inter alia, received attendant commissions.

In *Schlifke,* we affirmed a grant of summary judgment for the defendant, the parent corporation of a bank that had made a loan, secured by letters of credit, to an oil-and-gas limited partnership. The loan documents appeared in the prospectus. We found that the bank "had no power to control the ... sales personnel or to dictate the manner in which the allegedly fraudulent sales of securities were made; it merely prescribed requirements for the letters of credit...." *Schlifke,* 866 F.2d at 950. In a diversity action arising under the Illinois Securities Law of 1953, ILL.REV.STAT. ch. 121½, ¶ 137.1 *et seq.,* we affirmed a district court's finding that the broker and its salesperson were jointly and severally liable and that the clearing agent, Bear, Stearns, was not:

> [A]s the clearing agent in these transactions, Bear, Stearns did not play a central or specialized role. Instead, it performed a simple, albeit necessary, accounting function in order to process the orders. We will not impose the broad liability reserved under the Illinois Act for underwriters, dealers or salespersons for the performance of such limited, ministerial acts.

*Carlson v. Bear, Stearns & Co.,* 906 F.2d 315, 317 (7th Cir.1990). The point is well made.

Clearly, we have never approved or used the culpable-participant test, nor have we ever used any similar test to so stingily limit the definition of control person.

Moreover, the court of appeals that Judge Duff unfortunately relied upon as precedent for the culpable-participant test has, since, expressly rejected that test and has, instead, adopted a test which greatly expands Section 20(a)'s circle of liability.

The Court of Appeals for the Ninth Circuit, sitting en banc, reversed a district court's summary judgment for the defendant and held "that a broker-dealer is a controlling person under § 20(a) with respect to its registered representatives." *Hollinger,* 914 F.2d at 1573. In so doing, the court overruled prior decisions in *Christoffel,* the case relied upon by Judge Duff, and *Buhler v. Audio Leasing Corp.,* 807 F.2d 833 (9th Cir.1987), among others. The court expressly rejected the "culpable participation" test of control (*Hollinger,* 914 F.2d at 1575), stating, instead, that a plaintiff "need only show that ... [the actor] was not himself a registered broker-dealer but was a representative employed by or associated with a registered broker-dealer." *Id.* at 1574. But as the court explained:

> [W]e do not mean that a broker-dealer is vicariously liable under § 20(a) for all actions taken by its registered representatives. Nor are we making the broker-dealer the "insurer" of its representatives.... [T]he "controlling person" can avoid liability if she acted in good faith and did not directly or indirectly induce the violations.

*Id.* at 1575. In a footnote the court observed,

> The broker dealer may also, of course, rely on a contention that the representative was acting outside the broker-dealer's statutory "control." For example ... [the plaintiff was] placing the money with ... [the actor] for purposes other than investment in markets to which [the actor] had access only by reason of his relationship with [the] broker-dealer....

*Id.* at 1575–76 n. 26.

▮ We have long viewed the statute as remedial, to be construed liberally, and "'requiring only some indirect means of discipline or influence short of actual direction to hold a "control person" liable.'"

*First Securities I*, 463 F.2d at 987 (quoting *Myzel v. Fields*, 386 F.2d 718, 738 (8th Cir.1967), *cert. denied*, 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968), which was cited for the same proposition by *Metge*, 762 F.2d at 630). We have never construed "control" as narrowly as the district court below, nor have we construed it as broadly as the court in *Hollinger*. We have looked to whether the alleged control-person actually participated in, that is, exercised control over, the operations of the person in general and, then, to whether the alleged control-person possessed the power or ability to control the specific transaction or activity upon which the primary violation was predicated, whether or not that power was exercised.

Here Harrison alleged and Dean Witter has not disputed that Dean Witter is a broker-dealer and that Kenning and Carpenter were its employees—the former as a registered representative, vice president, and account executive and the latter as a registered representative and Kenning's assistant. Additionally, both had assigned office-space at the Boca Raton branch of Dean Witter, a local, office telephone number, an "800" telephone number, and "Dean Witter" business cards, among other indicia of authority. Carpenter but not Kenning, who was facing bankruptcy, maintained an employee account at Dean Witter; Kenning actually controlled it, however. Dean Witter's rules required the local branch manager to sign all order tickets for employee accounts and to monitor the accounts' activities; the rules also prohibited commingling employee and client funds as well as sharing an interest in an account with anyone other than a close relative. Nonetheless, Harrison's money, sent to Kenning and Carpenter either at home or to a personal bank account, always landed rather quickly in Carpenter's account at Dean Witter.

■ The alleged facts are sufficient to prevent our finding, as a matter of law, either that Dean Witter did not actually exercise control over the operations of Kenning and Carpenter in general or that Dean Witter did not possess the power or ability

to control Kenning and Carpenter's transactions upon which the primary violation is predicated. Accordingly, it was error to grant Dean Witter's motion for summary judgment on the basis that Dean Witter was not a controlling person. We leave that determination to the factfinder.

■ But the analysis does not end here. The statute provides an affirmative defense for controlling persons, one which the defendant bears the burden of proving. *Fey v. Walston & Co.*, 493 F.2d 1036, 1051–52 (7th Cir.1974); *Hollinger*, 914 F.2d at 1575 n. 25 (citing, inter alia, *Fey*, 493 F.2d at 1051–52). Section 20(a) of the 1934 Act provides that a controlling-person defendant is not liable if the defendant can show he or she "acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t. Thus, once controlling-person status is shown, "a broker-dealer would be liable for its employee's acts under Section 20(a) if it 'did not maintain a reasonably adequate system of internal supervision and control over the [registered representative] or did not enforce with any reasonable diligence such system * * *.' " *Henricksen v. Henricksen*, 640 F.2d 880, 884 (7th Cir.), *cert. denied*, 454 U.S. 1097, 102 S.Ct. 669, 70 L.Ed.2d 637 (1981) (quoting *Fey*, 493 F.2d at 1051; bracketed material and asterisks added by the *Henricksen* court). In affirming the district court's finding of liability, the *Henricksen* court held, inter alia,

> We cannot agree, however, that Smith Barney was reasonably diligent in its supervision of the trading in ... [the plaintiff's] account, and we further conclude that this lack of reasonable diligence in combination with the generally casual supervision of ... [the defendant employee's] activities contributed not only to the trading losses and commission expenses but to the conversions as well.

*Id.* at 885.

The alleged facts indicate Dean Witter had rules in place to prevent various types of fraud. For example, in addition to those noted above, the rules also required that supervisors ensure an employee's invest-

ments were commensurate with his or her resources. Indeed, on more than one occasion the head of Dean Witter's compliance department asked the local branch manager to investigate the heavy volume in Carpenter's account. He did ask Carpenter and Kenning about it, but apparently accepted without further investigation Carpenter's explanation that it was his own money. *Harrison*, 715 F.Supp. at 1425. As it turned out, the two lost some $600,-000 in roughly their first year at Dean Witter and some $2,000,000 over the ensuing two years without attracting, what they might consider, unwarranted attention. Under the alleged facts of the present case we cannot say, as a matter of law, that Dean Witter acted in good faith and neither directly nor indirectly induced the act or acts constituting the violation. This determination, too, must be left to the factfinder.

CHOICE OF LAW

The district court applied Illinois law to all state-law claims Harrison raised. He argues this was error and that Florida law controls these claims. Dean Witter responds that Harrison failed to object to the district court's applying Illinois law and, thus, cannot raise this issue on appeal.

■ Under *Erie* and *Klaxon* a federal court exercising diversity jurisdiction "must look to the law of the forum in which it sits for substantive law, ... including the rules governing choice of law." *International Administrators, Inc. v. Life Insurance Co. of North America*, 753 F.2d 1373, 1376 n. 4 (7th Cir.1985) (citing *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 71–80, 58 S.Ct. 817, 818–23, 82 L.Ed. 1188 (1938), and *Klaxon Co. v. Stentor Electric Manufacturing Co., Inc.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021–22, 85 L.Ed. 1477 (1941)). However, where, on the record, neither party objected to the district court's

choice of law, "it is not open to us to reconsider that issue, absent some compelling reason of policy." *International Administrators*, 753 F.2d at 1376 (footnote omitted). Moreover, if neither party argues for application of a particular state's law, the law of the forum is presumptively applied. *Wood v. Mid–Valley Inc.*, 942 F.2d 425, 426 (7th Cir.1991). Harrison cites no objection made on the record and does not claim to have otherwise raised the issue before the judge,[3] and the district court did apply the law of the forum state, Illinois. Accordingly, Harrison has waived the issue on appeal, and, under the circumstances, the court did not err in applying Illinois law to all of the state-law claims, whether they sought to impose direct or vicarious liability.

■ Harrison, nonetheless, argues he adequately raised the choice-of-law question in his first amended complaint in Counts X and XII. Harrison claims his reference in Count X (denominated, simply, "Conversion"), paragraph 85(a), to his prayer for "three-fold" damages identifies a sufficient argument for applying Florida law because Illinois has no comparable damages provision.[4] This argument is not sufficient to survive the rule of waiver. Neither has he presented a "compelling reason of policy" for applying Florida law by arguing that Florida allows a treble-damage award for conversion and Illinois does not. Furthermore, in relying solely on a damages argument he ignores the necessary predicate, a finding of liability, and, consequently, has not made the requisite argument that there is a "compelling reason of policy" to apply the Florida law of liability rather than the Illinois law. In Count XII Harrison did cite FLA.STAT. ch. 517.211 and 517.301, but, as in most of the other counts, he does not seek to impose direct liability on Dean Witter. Rather, he

3. At oral argument Harrison's attorney, who was also the attorney below, acknowledged that, before Judge Duff, which state's law applied was "[n]ever contested.... No argument by them; no argument by us on it."

4. Harrison also argues that in Count X, paragraphs 62–67, of his original complaint he expressly identified the Florida Civil Theft Act,

FLA.STAT. ch. 812.014(1). If anything, this argument is detrimental, because the express citation is nowhere to be found in Count X or any other count of the first amended complaint or, apparently, anywhere else in the record on appeal. At least, Harrison does not claim to have expressly cited that statute elsewhere.

seeks to impose vicarious liability for the acts of Kenning and Carpenter via *respondeat superior.* Thus, Harrison must show he also preserved the choice-of-law question with respect to the law of agency. This he has not done.

RESPONDEAT SUPERIOR

Finding the undisputed facts did not support Harrison's claim that Kenning and Carpenter had either actual or apparent authority from Dean Witter for their fraudulent acts, the district court granted Dean Witter summary judgment on the issue of *respondeat superior.* Harrison appeals only with respect to the issue of apparent authority but adds arguments that Kenning and Carpenter were acting within the scope of their employment and that their being employees or servants of Dean Witter subjects Dean Witter to "status-based" liability.

Because we agree with the district court that, as a matter of law, neither Kenning nor Carpenter bore the mantle of apparent authority, Harrison's two additional arguments fail. The first argument fails because Kenning and Carpenter had no authority to commit the fraud and neither one was seeking to benefit the employer.[5] Thus, they were acting outside the scope of their employment. The second argument fails because it requires a showing that the agent was "apparently acting within his authority," and, as we shall now see, neither Kenning nor Carpenter were. Restatement (Second) of Agency § 261.

A recent decision of the Illinois Supreme Court, unfortunately not available to the parties before briefing, well summarizes the law of agency with respect to apparent authority.

It is a well-established precept of agency law that a principal will be bound by the authority he *appears* to give to another, as well as the authority which he actually gives. Apparent authority arises where a principal creates, through words or conduct, the reasonable impression that the putative agent has been granted authority to perform certain acts. Apparent authority is that authority which a reasonably prudent person, in view of the principal's conduct, would naturally suppose the agent to possess.

*State Security Insurance Co. v. Burgos,* 145 Ill.2d 423, 164 Ill.Dec. 631, 635, 583 N.E.2d 547, 551 (1991) (summary judgment finding apparent authority affirmed; citations omitted including two cited by Harrison; emphasis in *Burgos* ).

As stated earlier by the Illinois Supreme Court, "The theory of apparent authority rests on two premises: a manifestation by the principal to a third party, and belief by that third party that the extent of the authority granted to the agent encompasses the contemplated activity." *Simpson v. Compagnie Nationale Air France,* 42 Ill.2d 496, 248 N.E.2d 117, 120 (1969) (citing Restatement (Second) Agency § 8).[6] Also citing Restatement (Second) Agency, but at Section 261, Comment *a,* the Supreme Court similarly observed:

Under an apparent authority theory, '[l]iability is based upon the fact that the agent's position facilitates the consummation of the fraud, in that from the point of view of the third person the transaction seems regular on its face and the agent appears to be acting in the ordinary course of the business confided to him.'

*American Society of Mechanical Engineers, Inc. v. Hydrolevel Corp.,* 456 U.S. 556, 566, 102 S.Ct. 1935, 1942–43, 72 L.Ed.2d 330 (1982). Clearly, an essential element is the third party's reasonable belief that the agent is acting within the

---

5.  While it may be argued that Dean Witter received commissions on the activity Carpenter's account generated, it must be noted the commissions would have been greater had the activity been in a regular customer's account.

6.  In the first decade of this century the Illinois court had held:

"It rested upon the plaintiff to affirmatively show that [the act] ... was within the apparent scope of the authority of the [employee] ... and that he did not know or have reasonable grounds to believe that the [employee] was exceeding his authority." *Illinois Central Railroad Co. v. Jennings,* 217 Ill. 140, 75 N.E. 457, 459 (1905).

authority granted by the principal, that the transaction appears to be regular and in the ordinary course of business. That element is missing from Harrison's case.

■ Here the undisputed facts show Harrison did not open an account with Dean Witter but, instead, transferred money to Kenning and Carpenter for them to place in Carpenter's employee account at Dean Witter for subsequent investment. In so doing, Harrison expected to enhance his return by paying the lower commission charged Dean Witter employees, although he was not an employee entitled to that benefit. It is clear neither Kenning nor Carpenter had the authority, either actual or apparent, to use the account thusly; Dean Witter's rules expressly forbad it, as would ordinary prudence.

We cannot nor can any reasonably prudent person naturally suppose that Kenning and Carpenter possessed the authority to use the employee account for Harrison's benefit. It simply is not believable that their authority would extend so far. Furthermore, Harrison's transactions with Kenning and Carpenter were not regular on their face and could not appear to be within the ordinary course of business, within the ordinary course of their business, at Dean Witter.

Therefore, we hold the district court correctly found Dean Witter was not liable under *respondeat superior* for any of the state-law, vicarious liability claims Harrison raised.

## NEGLIGENT HIRING AND RETENTION

Illinois, in *Tatham v. Wabash Railroad Co.*, 412 Ill. 568, 107 N.E.2d 735 (1952), recognized an employee's intentional tort as a basis for the tort of negligent hiring and retention. *Becken v. Manpower, Inc.*, 532 F.2d 56, 58 (7th Cir.1976); *Bates v. Doria*, 150 Ill.App.3d 1025, 104 Ill.Dec. 191, 195, 502 N.E.2d 454, 458 (2nd Dist.1986). Accordingly, "an employer is liable for hiring and retaining unfit and incompetent employees ... where there has been an intentional tort or criminal conduct by the employee." *Martin v. Yellow Cab Co.*, 208 Ill.App.3d 572, 153 Ill.Dec. 503, 508, 567 N.E.2d 461, 466 (1st Dist.1990) (citation omitted); *Tatham*, 107 N.E.2d at 739. This is a negligence tort; thus, "the plaintiff's allegations must establish (1) the existence of a duty of care owed by the defendant to the plaintiff, (2) a breach of that duty, and (3) injury to plaintiff (4) proximately resulting from the breach." *Puckett v. Mr. Lucky's Ltd.*, 175 Ill.App.3d 355, 125 Ill. Dec. 93, 96, 529 N.E.2d 1169, 1172 (4th Dist.1988) (Knecht, J., dissenting; citations omitted); *see also McLane v. Russell*, 131 Ill.2d 509, 137 Ill.Dec. 554, 556–57, 546 N.E.2d 499, 501–02 (1989). "The existence of a duty is a question of law to be determined by the court" (*Puckett*, 125 Ill.Dec. at 96, 529 N.E.2d at 1172 (Knecht, J., dissenting; citation omitted)), but it remains "for the trier of fact to determine if that duty was breached." *Pippin v. Chicago Housing Authority*, 78 Ill.2d 204, 35 Ill. Dec. 530, 534, 399 N.E.2d 596, 600 (1979).

■ Here the district court found Dean Witter had no duty to protect Harrison from the wrongdoing of its employees, Kenning and Carpenter. Thus, the court entered judgment as a matter of law in favor of Dean Witter. We review *de novo* (*Salve Regina College v. Russell*, —— U.S. ——, 111 S.Ct. 1217, 113 L.Ed.2d 190 (1991)) and agree that Dean Witter did not owe Harrison the common-law duty claimed.

Illinois courts have regularly held that, for a duty of care to exist, the plaintiff and defendant must stand "in such a relationship to one another that the law impose[s] upon the defendant an obligation of reasonable conduct for the benefit of the plaintiff." *McLane*, 137 Ill.Dec. at 557, 546 N.E.2d at 502. Illinois courts have found a claim of negligent hiring and retention adequately stated, reversed a dismissal or summary judgment for the defendant, or affirmed a verdict for the plaintiff where the following relationships existed:[7] (1) the

---

**7.** In *Malorney v. B & L Motor Freight, Inc.*, 146 Ill.App.3d 265, 100 Ill.Dec. 21, 24, 496 N.E.2d 1086, 1089 (1st Dist.1986) (17–year–old plaintiff-

hitchhiker repeatedly raped and assaulted in sleeper cab of truck by its driver), the court found the employer had a "duty to hire a com-

plaintiff is an employee of the defendant (*Tatham,* 107 N.E.2d 735); (2) the plaintiff contracted for defendant's services (*Becken,* 532 F.2d 56; *Easley v. Apollo Detective Agency, Inc.,* 69 Ill.App.3d 920, 26 Ill.Dec. 313, 387 N.E.2d 1241 (1st Dist.1979) (tenant raped by guard employed by agency employed by landlord to provide security)); (3) the plaintiff is the defendant landlord's tenant or the social guest of a tenant (*Pippin,* 35 Ill.Dec. 530, 399 N.E.2d 596; *Cross v. Wells Fargo Alarm Services,* 82 Ill.2d 313, 45 Ill.Dec. 121, 412 N.E.2d 472 (1980); *Phillips v. Chicago Housing Authority,* 89 Ill.2d 122, 59 Ill.Dec. 281, 431 N.E.2d 1038 (1982)); and (4) the plaintiff is the social guest of the defendant host (*Gregor v. Kleiser,* 111 Ill.App.3d 333, 67 Ill. Dec. 38, 443 N.E.2d 1162 (2nd Dist.1982)). Additionally, we have noted that while Illinois does not generally

> impose a duty to protect others from criminal attacks [ (and, we might now add, acts) ] by third parties, ... the Illinois courts have recognized exceptions to this rule where the criminal attack was reasonably foreseeable and the parties had a 'special relationship:' (1) carrier-passenger, (2) innkeeper-guest, (3) business invitor-invitee, or (4) voluntary custodian-protectee.

*Figueroa v. Evangelical Covenant Church,* 879 F.2d 1427, 1430 (7th Cir.1989) (citations omitted).

The undisputed facts show no special, duty-creating relationship existed between Dean Witter and Harrison. Harrison had no account at Dean Witter. Moreover, no alleged fact indicates he was ever a customer of, had ever purchased a security from, or had ever placed an investment with the Boca Raton branch of Dean Witter. Thus, even if Dean Witter were negligent in hiring and retaining Kenning or Carpenter, no duty arose under the circumstances here.

## RULE 11 SANCTIONS

The district court imposed sanctions under Fed.R.Civ.P. 11 on Harrison's attorney, Thomas P. Ward, in the amount of $20,-860.50 in attorney's fees for raising two frivolous claims: Count III, the claim under Section 1962(c) of RICO, which the court dismissed early on, and Count V, the claim on the promissory notes. Dean Witter had sought sanctions on the other counts, too, claiming all were frivolous, but the court declined. Both Harrison and Dean Witter appealed.

Dean Witter points out that Harrison did not name Ward as an appellant in its notice of appeal, otherwise timely filed on March 1, 1991, and argues that under *Torres v. Oakland Scavenger Co.,* 487 U.S. 312, 108 S.Ct. 2405, 101 L.Ed.2d 285 (1988), we lack jurisdiction on this portion of the appeal for appellants' failure to comply with the requirement of Fed.R.App.P. 3(c). That rule states, "The notice of appeal shall specify the party or parties taking the appeal...." *Torres,* 487 U.S. at 314, 108 S.Ct. at 2407, held, "The failure to name a party in a notice of appeal is more than excusable 'informality'; it constitutes a failure of that party to appeal." While Fed.R.App.P. 3(c) also provides, "An appeal shall not be dismissed for informality of form or title of the notice of appeal," it was of no avail to the party in *Torres:* "But although a court may construe the Rules liberally in determining whether they have been complied with, it may not waive the jurisdictional requirements of Rules 3 and 4, even for 'good cause shown' under Rule 2, if it finds that they have not been met." *Torres,* 487 U.S. at 317, 108 S.Ct. at 2409.

We have stated, "*Torres* made the requirements of Rule 3(c) inflexible." *FTC v. Amy Travel Service, Inc.,* 875 F.2d 564, 577 (7th Cir.), *cert. denied,* 493 U.S. 954, 110 S.Ct. 366, 107 L.Ed.2d 352 (1989). We have no jurisdiction over an appeal or that part of an appeal where the party taking

---

petent driver who was to be entrusted with a ... [sleeper-equipped,] over-the-road truck" and, accordingly, affirmed the trial court's denial of defendant's motion for summary judgment. The duty found in *Malorney* was based in part on the observation that truck drivers "are prone

to give rides to hitchhikers despite rules [to the contrary]" and incorporated the concept of entrustment. *Id.,* 100 Ill.Dec. at 24, 496 N.E.2d at 1089. Harrison has raised neither the issue of widespread propensity to violate brokerage-house rules nor the issue of entrustment.

the appeal is not named in the notice of appeal. *Id.* Because attorneys sanctioned by the district court are the real parties in interest, "the attorneys must appeal in their own names." *Rogers v. National Union Fire Insurance Co.,* 864 F.2d 557, 560 (7th Cir.1988) (citation omitted). This attorney Ward did not do.

■ Appellants argue, however, that upon discovery of this error they filed a motion to amend the notice of appeal under Fed.R.App.P. 27. They find support for our granting their motion in a statement in *Torres* that the party there had not sought to amend the defective notice of appeal. The *Torres* Court actually stated, "Nor did petitioner seek leave to amend the notice of appeal within the time limits set by Rule 4." *Torres,* 487 U.S. at 317, 108 S.Ct. at 2409. Fed.R.App.P. 4(a)(1) requires the notice of appeal be filed within "30 days after the date of entry of the judgment or order appealed from...." Rule 4(a)(5) permits the district court to

> extend the time for filing of a notice of appeal upon motion filed not later than 30 days after the expiration of the time prescribed by this Rule 4(a).... No such extension shall exceed 30 days past such prescribed time or 10 days from the date of entry of the order granting the motion, whichever occurs later.

As made clear in *United States ex rel. Leonard v. O'Leary,* 788 F.2d 1238, 1239 (7th Cir.1986), Rule 4(a)(5) grants a grace period of no more than thirty days beyond the initial 30–day deadline. Here appellants' motion to amend was filed June 10, 1991, 124 days after the entry of final judgment on February 6, 1991, 101 days after the errant notice of appeal was filed, and 94 days after the last day to file its notice of appeal, which under Rule 4(a)(1) was March 8, 1991. Appellants did not seek to amend their notice of appeal "within the time limits set by Rule 4." Accordingly, we have jurisdiction over neither their motion to amend nor that portion of the appeal challenging the district court's imposition of Rule 11 sanctions on attorney Ward.

■ On cross-appeal Dean Witter, citing Fed.R.Civ.P. 11 and 28 U.S.C. § 1927, argues it was improperly denied sanctions in the form of attorney's fees on the other claims raised by Harrison: namely, Counts I, II, IV, and VI through XII. Whether to award sanctions is within the discretion of the district court, and, accordingly, we review the district court's decision only for abuse of discretion. *Cooter & Gell v. Hartmarx Corp.,* 496 U.S. 384, 405, 110 S.Ct. 2447, 2460–61, 110 L.Ed.2d 359 (1990); *Kotsilieris v. Chalmers,* 966 F.2d 1181, 1183 (7th Cir.1992).

■ Dean Witter first argues that it was denied a proper hearing on its motion for sanctions because the motion was heard by a judge other than the one that handled earlier aspects of the case, including defendant's motion for summary judgment. Dean Witter does not, however, find the sanctions that were awarded by this latter judge similarly tainted. The contention, without more, is clearly without merit. *See Automatic Liquid Packaging, Inc. v. Dominik,* 909 F.2d 1001, 1006 (7th Cir. 1990) (In deciding a Rule 11 motion, it is not improper for a district court judge to rely on events that occurred before another judge and that are discoverable only by reviewing the record.).

■ In a carefully detailed, well reasoned opinion, Judge Lindberg found that, except for Counts III and V, Harrison's claims were neither frivolous nor raised for improper purposes. The court observed that, although the law was otherwise, Dean Witter seemed to argue that its having won the summary judgment motion proved the plaintiffs had not conducted a reasonable inquiry into the law and the facts. *See Mars Steel Corp. v. Continental Bank N.A.,* 880 F.2d 928, 932 (7th Cir.1989) (en banc) ("Rule 11 focuses on inputs rather than outputs, conduct rather than results."), and *Prochotsky v. Baker & McKenzie,* 966 F.2d 333 (7th Cir.1992) (district court's award of summary judgment for defendant and concomitant denial of Rule 11 sanctions affirmed). Dean Witter raises the same, impecunious argument here, and others, too. We have carefully

reviewed the district court's findings and the record. We cannot find that the district court abused its discretion, and, therefore, we affirm its partial denial of sanctions.

Lastly, claiming Harrison's appeal of sanctions was frivolous because of the obvious, undisputable jurisdictional bar, Dean Witter asks for sanctions under Fed. R.App.P. 38. Dean Witter points out that it had advised attorney Ward by letter, long ago, both of the jurisdictional bar and that it would seek sanctions if he persisted. He, obviously, persisted, but we deny Dean Witter's motion. The appeal was not frivolous.

## CONCLUSION

We reverse the district court's grant of summary judgment with respect to the claim raised under Section 20(a) of the Securities Exchange Act of 1934 and remand for further proceedings, but we affirm the remainder of the district court's judgments and orders. For want of jurisdiction, we dismiss appellants' appeal on the imposition of Rule 11 sanctions.

Parties shall bear their own costs.

AFFIRMED IN PART, REVERSED IN PART AND REMANDED, and DISMISSED IN PART.