Terence DONOHOE, et al., Plaintiffs,

v.

**CONSOLIDATED OPERATING & PRODUCTION CORPORATION, et al., Defendants.**

No. 86 C 7543.

United States District Court, N.D. Illinois, E.D.

Sept. 28, 1993.

Norman Rifkind, Chicago, IL, for plaintiffs.

Douglas P. Roller, Naperville, IL, for defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

This drama has already had a longer run than this particular critic's reviews would originally have called for. With less than one act remaining—the single scene that is based on Securities Exchange Act of 1934 § 20(a), 15 U.S.C. § 78t(a) ("Section 20(a)")—remaining defendants Jack Nortman ("Nortman") and Morrando Berrettini ("Berrettini") and the partnership in which they were principals (Consolidated Operating & Production Corporation, "COPCO") have moved for summary judgment on that claim. For the reasons stated in this memorandum opinion and order, their motion is granted and the final curtain rings down on this entire action.

### Background

Because this action has already occupied a good deal of space in the West Reporter system—this Court's opinions reported at

736 F.Supp. 845 (N.D.Ill.1990) ("*Opinion I*") and at 763 F.Supp. 315 (N.D.Ill.1991) ("*Opinion II*") and our Court of Appeals' opinion reported at 982 F.2d 1130 (7th Cir.1992) ("*Opinion III*")[1]—there is really no need to repeat the statements of fact that have been set out at length in those opinions. Despite this Court's normal preference for producing self-contained opinions, this opinion will simply assume the reader's total familiarity with the earlier published opinions, setting out the facts only as required in the course of the substantive discussion. And along the same lines, this opinion will employ the defined terms that were used in its earlier opinions. In that respect:

1. Because Nortman, Berrettini and COPCO are the only remaining defendants (*Opinion I* at 846 & n. 1), they will continue to be referred to collectively as "defendants," without reference to the other defendants who are out of the case.

2. Terrence Donohoe and his fellow disgruntled investors will of course continue to be termed "plaintiffs."

3. Even though other actors referred to here are among those who have been identified by last name or other short description in earlier opinions, to avoid sounding too cryptic this opinion will use their full names when they first come up in the discussion (but will eschew any repetition of the description of their respective roles).

*Prior Proceedings and the Surviving Claim*

Originally plaintiffs sued Dennis Bridges ("Bridges," the active culprit in this oil development partnership debacle) along with Nortman, Berrettini, COPCO and Bridges' wholly owned operating corporations Ona Drilling Corporation ("Ona") and Onshore Rig Corporation ("Onshore"). Plaintiffs asserted a host of claims, summarized in *Opinion I* at 846 as "several violations of the federal securities laws' anti-fraud provisions and registration requirements, violation of Illinois state securities laws, common law fraud, breach of fiduciary duty and two types of RICO violations."

*Opinion I* granted summary judgment against plaintiffs on virtually all of those claims, in large part because plaintiffs had failed to present any material issue of fact as to the necessary element of an intent to defraud, but also because there was no issue of material fact suggesting recklessness on the part of Nortman or Berrettini either. Next *Opinion II* addressed the single securities law count that was not contingent on any element of scienter or its equivalent—a claim under Securities Act of 1933 § 12(2), 15 U.S.C. § 77*l* (2)—and granted summary judgment on statute of limitations grounds in that respect, so that the entire action was then dismissed with prejudice.

On appeal this Court's determinations were affirmed in their entirety, with the limited exception of the remand of the Section 20(a) claim. Writing for the Court of Appeals in *Opinion III*, Judge Cudahy gave this Court more than its due en route to explaining why the Section 20(a) issue had to be addressed on remand (*Opinion III* at 1138):

It is difficult to believe that a distinguished district court judge, with a well-earned reputation for writing meticulous, scholarly opinions, could dedicate 96 manuscript pages to a complaint without addressing every significant claim.

In that respect there seem to be two possibilities. One would be to disclaim the flattering characterization, the other to provide an explanation as to what the Court of Appeals viewed as an omission on this Court's part. This opinion will do both. Although the first possibility requires no more than a blushing thank-you and demurrer, the second calls for a bit more elaboration.

Here is what *Opinion III* at 1138 (footnote omitted) said about plaintiffs' preservation of the Section 20(a) issue:

Although the plaintiffs have approached the outer limits of waiver, we do not believe that they in fact waived their claim. First, control person liability is plainly and expressly alleged in the plaintiffs' complaint. Complaint ¶ 5.7 (R. 66 at 3). Sec-

1. Citations to the previously-reported opinions will take the form "Opinion—at—," reflecting the page number but not the volume number in the appropriate reporter.

ond, although the investors devoted only one sentence to control person liability in their memorandum in opposition to the motion for summary judgment (R. 164 at 25), the issue of control person liability did not get much attention in the motion to which they were responding. (R. 153, *passim*).

And here is what the cited pleading (Complaint ¶ 5.7[2]) had alleged:

Defendants Bridges, Berrettini and Nortman controlled COPCO within the meaning of Section 20(a) of the Exchange Act and Section 15 of the Securities Act. Defendant Bridges controlled defendants Ona and Onshore within the meaning of Section 20(a) of the Exchange Act and Section 15 of the Securities Act.

What is troublesome, and will be elaborated on a bit later, is that *Opinion III* at 1138–39 preserved plaintiffs' Section 20(a) claim only on the basis that there was sufficient evidence that Nortman and Berrettini controlled *Bridges* (the real culprit) within the meaning of that statute. But the plain reading of Complaint ¶ 5.7 shows that no such allegation was contained there.[3] Indeed, in the course of the current briefing P. Mem. 8–9 urges that "Plaintiffs are Entitled to Amend the Complaint To Plead That COPCO, Nortman and Berrettini Controlled Bridges and Ona"—and plaintiffs relatedly point out (*id.* at 9 n. 5) that defendants have acknowledged "that they were aware of plaintiffs' theory *at least during the appeal*" (emphasis added). Not a word is said (quite understandably) to suggest that either defendants or this Court were—or could have been—aware of a theory that plaintiffs never put forward at any time during the pendency of this action at the district court level. This Court's short suit is mindreading, and it must be said that plaintiffs clearly did *not* ever advance before this Court, prior to the appeal, what is now their only surviving claim.

Still another factor tells why this Court could not have perceived that plaintiffs had purportedly inserted the presently-stated Section 20(a) needle into the huge haystack that they tendered in response to defendants' summary judgment motion that produced *Opinion I*.[4] As the quoted language from *Opinion III* indicates, the one sentence (!) in that entire paper haystack that spoke to the issue of Section 20(a) liability at all was not in their pleading or in their evidentiary submissions, but in one of their legal memoranda in response to defendants' summary judgment motion. And of course it is established Seventh Circuit law (as it is everywhere) that parties' memoranda are not part of the pleadings, let alone evidence, and that such memoranda cannot be used to supply missing ingredients in that respect (*Car Carriers, Inc. v. Ford Motor Co.,* 745 F.2d 1101, 1107 (7th Cir.1984)). And the clincher is that even that single sentence was framed in the same way as Complaint ¶ 5.7: not in terms of Nortman and Berrettini controlling Bridges, but solely in terms of the three of them

---

**2.** In fact the version of plaintiffs' pleading before this Court at the time of defendants' summary judgment motions was plaintiffs' counsel's *fifth* recasting of their allegations, the Fourth Amended Complaint. This opinion uses "Complaint" for the sake of simplicity.

**3.** On the current motion, P. Mem. 2 n. 1 concedes "that since COPCO was found to have no liability directly for the alleged fraud, it cannot be the basis for control person liability against Nortman and Berrettini." And though plaintiffs still persist in their attempted shell game by also stating in the same footnote that defendants can be held accountable if they controlled Ona, their own allegations put the lie to that prospect—not only Complaint ¶ 5.7, but also Complaint ¶ 10's allegation that "defendants Ona and Onshore are 100% owned and controlled by defendant Bridges." Thus the only possible predicate for plaintiffs' sole remaining claim is the one that they did *not* allege in the Complaint: that Nortman and Berrettini controlled Bridges.

**4.** *Opinion I* at 846 n. 2 described the enormous volume of the parties' submission:

It was a difficult decision whether to measure those paper submissions by the pound or by the inch (the other alternative of totaling up pages would have involved too laborious a counting and adding process).

As that footnote continued to explain, the briefing on the merits was well over two inches thick, the respective statements of facts and supporting exhibits were over a foot thick, and there was another two-inch pile of paper devoted to defendants' attack and plaintiffs' response as to the admissibility of some of the affidavits that plaintiffs had submitted.

controlling COPCO (which has been held to be entirely nonculpable).

All of that, however, is past. Because the Court of Appeals has spoken to the matter, "What is past is prologue"[5]—and the specific question for decision as posed in *Opinion III* at 1139 and 1141 is whether Nortman and Berrettini are entitled to judgment because their good faith brings them within the statutory exception to Section 20(a). Although that would thus appear to be the limited scope of this Court's mandate on remand, each side seems to have interpreted the remand as an opportunity to relitigate some of its own favorite positions. Hence this opinion will also be called upon to separate legal wheat from legal chaff in defining the issues.

### *Waiver?*

 As the first candidate for chaff treatment, D. Mem. 5 contends that plaintiffs' failure to allege a controlling person theory as to Bridges effectively bars them from taking advantage of the Court of Appeals' preservation of that issue. Because (as already discussed) Complaint ¶ 5.7 does *not* in fact allege anything at all that speaks of Nortman's and Berrettini's asserted control over *Bridges,* and because none of the other allegations in the Complaint even suggests that as a contention on plaintiffs' part,[6] that argument would have substantial force if this Court were writing on a clean slate.

But it is not. As already stated, *Opinion III* at 1138 has certainly given plaintiffs the benefit of the doubt on any waiver claim:

Although the plaintiffs have approached the outer limits of waiver, we do not believe that they in fact waived their claim.

Whether overly charitable or otherwise, that ruling is the law of the case (*Arizona v. California,* 460 U.S. 605, 618, 103 S.Ct. 1382, 1391, 75 L.Ed.2d 318 (1983)) unless defendants can somehow undermine the Court of Appeals' ruling on the next ground discussed here.

### *Misrepresentation?*

D.R. Mem. 2–3 relatedly urges that the control person theory is not fairly open to defendants because they procured the Court of Appeals' acceptance of that theory by sheer deception. And there is little question that plaintiffs sought to lead the Court of Appeals down the garden path—as already demonstrated, when that court referred to the "control person liability [that] is plainly and expressly alleged in the plaintiffs' Complaint," citing to Complaint ¶ 5.7 (*Opinion III* at 1138), it was *not at all* describing the control person liability on which plaintiffs now seek to hang their hats.

This is not the first instance in which plaintiffs' litigation style in this action has been questionable. And this instance is bothersome indeed: It has already been said that even the one sentence in plaintiffs' memorandum opposing summary judgment before this Court—the sentence to which the Court of Appeals referred in its opinion—asserted that Nortman and Berrettini were "controlling persons of *COPCO* " and *not* of Bridges. And plaintiffs' brief on appeal (the relevant pages of which they have provided to this Court in their surreply on the current motion) is extraordinarily dubious in that same respect—their counsel's factual emphasis there was on the Nortman–Berrettini control of COPCO, but then they segued into a statement that this Court had "erred in granting defendants' motion for summary judgment without addressing their liability as 'controlling persons' of COPCO (the entity on whose behalf Bridges was working, in part), Ona (the other entity), and Bridges." Not one word is said in plaintiffs' brief on appeal about the total absence, in their Complaint or in what they had argued at great length before this Court, of any claim that Nortman and Berrettini controlled Bridges.

Lest there be any question on that score, plaintiffs have really confirmed that in their briefing on the current motion by stating that they should *now* be permitted to amend their Complaint to make that allegation. They couple that request with their argu-

---

**5.** William Shakespeare, *The Tempest* act 4, sc.1, line 261.

**6.** Not incidentally, Complaint ¶ 7 describes Bridges alone as the "mastermind of the fraudulent investment scheme."

ment that what the Court ·of Appeals has stated must be accepted as law of the case. It must be said that what has been presented here appears to reflect a clear misapprehension on the part of the Court of Appeals, and one that would literally bring this case within one of the exceptions to the law of the case doctrine—the one that applies if the earlier decision was "clearly erroneous." As *Parts & Elec. Motors, Inc. v. Sterling Elec., Inc.,* 866 F.2d 228, 231 (7th Cir.1988) explains the doctrine:

> Thus, although it is not an "immutable concept," the doctrine should be applied unless unusual circumstances or a compelling reason render it inapplicable. These circumstances include "(1) substantial new evidence introduced after the first review, (2) a decision of the Supreme Court after the first review that is inconsistent with the decision on that review, and (3) a conviction on the part of the second reviewing court that the decision of the first was clearly erroneous."

Accord, *Weidner v. Thieret,* 932 F.2d 626, 631 (7th Cir.1991), quoting *Anderson v. Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) ("[W]e can only find that a prior decision is not law of the case if ' "on ·the entire evidence, [we] are left with the definite and firm conviction that a mistake has been committed." ' ").

That prospect is awkward, however, for two reasons. For one thing, the notion of a district court characterizing a Court of Appeals' decision as "clearly erroneous" smacks of presumptuousness even under circumstances such as this, where the perceived error was clearly induced by one of the litigants. Indeed, the conventional statement of the law of the case doctrine (as indicated by

the *Parts & Elec. Motors* quotation) speaks of questions decided on an earlier appeal being followed on later *appeals*—and the conventional wisdom likewise calls for a district court to follow the terms of a Court of Appeals' remand unquestioningly. For another, this Court has no way of knowing whether the Court of Appeals' opinion actually reflected such an induced error (as certainly seems to be the case on its face), or whether instead the Court of Appeals recognized that plaintiffs had *not* made the argument that they were being credited with but should nonetheless have the chance to advance it to exhaust their possible claims.[7]

Accordingly this Court will simply rule that *if* the decision were wholly its own, it would hold that the Court of Appeals' preservation of a Section 20(a) claim for plaintiffs, based solely on the possibility of Nortman's and Berrettini's control over *Bridges,* was indeed "clearly erroneous"—for it was the result of plaintiffs' blatant misrepresentation of the case that they had brought, the case to which defendants had responded and the case on which this Court had ruled.[8] And this Court sees no reason whatever that plaintiffs should be allowed, fully seven years into this litigation, to replead their claim to assert that clearly afterthought basis for recovery. Discovery in the case closed early in 1989, and that was shortly followed by defendants' original summary judgment motion. As n. 2 points out, plaintiffs' present Complaint is their *Fourth* Amended Complaint, and they have said not a word as to any reason that they could not have presented this new claim years ago, based on what they and their lawyers have known all along (either when they brought the lawsuit to begin with or, at the latest, by the time that discov-

---

7. Just why that sort of special solicitude should be extended would of course be unknown to this Court, but part of the awkwardness referred to in this paragraph of the text stems from the obvious problem that a district court post-remand has not been privy to the deliberations of the Court of Appeals.

8. *Opinion I* did not indeed speak to the single Complaint ¶ 5.7, or to the single sentence in the mountain of paper before this Court that adverted to a Section 20(a) claim. But on that score it should be emphasized that a claim of control person liability based on Nortman's and Berretti-

ni's controlling *COPCO* (which was the only claim that was actually made by plaintiffs) was unsustainable by definition as soon as COPCO itself was found to be clearly innocent of any fraud—as *Opinion I* held after lengthy analysis, a determination that was part of the *Opinion III* affirmance. And as said earlier, defendants themselves have acknowledged that (their current Mem. 2 n. 1). So this Court's asserted error (if any) in its not having expressly addressed Section 20(a) was entirely harmless in substantive terms.

ery was completed). Moreover, defendants urge with considerable force that the new theory would require them to engage in additional discovery if they could not prevail on the current summary judgment motion.

In sum, nothing in the case calls for granting leave to plaintiffs to amend the pleadings at this late date and this late stage in the litigation (see *J.D. Marshall Int'l, Inc. v. Redstart, Inc.*, 935 F.2d 815, 819 (7th Cir. 1991)). That kind of delay poses an impermissible burden on the judicial system (viz. the present opinion) and on litigants in other cases, to say nothing of plaintiffs' unwarranted imposition on their adversaries in this case (*Perrian v. O'Grady*, 958 F.2d 192, 195 (7th Cir.1992) and cases cited there).

But for the reasons just expressed, it is not for this Court to resolve this matter by rejecting law of the case principles and by then scuttling plaintiffs' belatedly advanced Section 20(a) claim on the threshold grounds urged by defendants. Instead the preceding portions of this opinion are included because this case may again return to the Court of Appeals (for plaintiffs seem indefatigable), and because *that* Court may wish to reexamine the matter. It is time now for this ·opinion to address the merits (or more accurately the lack of merit) of the Section 20(a) claim as it has been totally recast by plaintiffs.

### Control Person Liability

█ Defendants also currently seek to argue that they were not in fact controlling persons as to culprit Bridges, even though *Opinion III* at 1138–39 discussed that subject at some length (in part confirming that Seventh Circuit law, as set out in *Harrison v. Dean Witter Reynolds, Inc.*, 974 F.2d 873, 880–81 (7th Cir.1992), has rejected the notion that Nortman and Berrettini themselves had to be culpable participants in order to establish such liability), and the Court of Appeals said in summary (*Opinion III* at 1139):

> Applying these standards to this case, there is sufficient evidence that Nortman and Berrettini controlled Bridges.

This opinion will not pause to parse defendants' arguments in that respect, because that statement by the Court of Appeals clearly comes within the law of the case doctrine. Instead this Court turns directly to the good faith exception to the imposition of Section 20(a) liability on control persons.

Here is Section 20(a):

> Every person who, directly or indirectly, controls any person liable under any provision of this title or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

Because the statute first sets out the predicate for control person liability, and it then states the good faith exception in "unless" terms, that exception is an affirmative defense that places the burden of proof on defendants (see *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1575 (9th Cir.1990), joining other circuits including our own in that holding). That shifting of burdens is what led *Opinion III* at 1139 to decline to resolve that issue, instead relegating it to this Court on remand.

In the most commonly encountered broker-dealer context, our Court of Appeals has long held that the Section 20(a) standard for measuring good faith is whether or not the control person maintained "a reasonably adequate system of internal supervision and control" over the agent, so that a control person can be found liable if it failed to "enforce with reasonable diligence such system, but on the contrary indirectly induced, participated in or approved and accepted the benefits of [the culpable activity]" (*Fey v. Walston & Co.*, 493 F.2d 1036, 1051 (7th Cir.1974)).[9] Important factors include the various internal rules in place to prevent fraud, coupled with the corresponding level of compliance

---

9. Although *Fey* involved a slightly different question, the sufficiency of jury instructions, its formulation of the test for good faith has become standard in this Circuit (see, e.g., *Harrison*, 974 F.2d at 881).

with those guidelines (see, e.g., *Harrison*, 974 F.2d at 881–82).

But what if the context is other than the broker-dealer situation, in which disputes most often arise as to whether or not to impute liability to brokerage houses for the acts of their unscrupulous employees? Situations such as the case at bar, in which the same established business structure with formalized internal rules and guidelines is far less likely to exist, are not well suited to application of the standard in precisely the terms stated in *Harrison* and like cases. As *G.A. Thompson & Co. v. Partridge*, 636 F.2d 945, 959 (5th Cir.1981) explains:

> Clearly, there are factual situations where the above standard [diligent enforcement of a reasonable system of supervision] makes little sense, such as ours. Presley was a controlling person of Lincoln which was liable due to Partridge's acts. Presley could not have supervised Partridge; Presley probably could not have effectively established a system which would have done so. But Presley could have done other things. Presley could have exercised his power in the day-to-day administrative matters to minimize the chance of a 10b–5 violation by Partridge. Presley also could have used his power to influence Partridge or to attempt to monitor Partridge's acts and act appropriately where Partridge had erred. Essentially, we do no more than state the obvious. The test of whether the controlling person has done enough to prevent the violation depends on what he could have done under the circumstances.[10]

This Court agrees that such a more flexible framework for analysis is appropriate to this case, and it will thus evaluate the propriety of the actions taken by control persons Nort-

man and Berrettini "under the circumstances."[11]

■ One other essential ingredient of the good faith exception to control person liability is a determination as to the requisite "state of mind" of the control person, a consideration that appears to have received no treatment in this Circuit until very recently.[12] Though neither side has cited the case, which was decided after submission of the parties' final memoranda on the current motion, this Court and the litigants are plainly bound by the teaching of *Monieson v. CFTC*, 996 F.2d 852, 860 (7th Cir.1993) (relying on *G.A. Thompson*, 636 F.2d at 959[13]):

> The controlling person must also act recklessly; negligence alone is not sufficient.

*Monieson* helps to point the way toward resolution of the final issues here. This Court has already conducted an extensive evaluation of the evidence bearing on defendants' state of mind covering the relevant time period (*Opinion I* at 874–76). That analysis concluded with the determination (*id.* at 876) that "plaintiffs have failed to raise an issue of fact, even in inferential terms, as to whether defendants had the requisite mental state [scienter or recklessness] to be liable for fraud," an unambiguous holding that has itself become the law of the case. And it should be stressed, given the nature of the remand, that the just-quoted determination owed nothing whatever to the placement of any burden of proof on plaintiffs—instead it proceeded on the basis (1) that the burden of proof was on defendants on *every* issue, (2) that all reasonable inferences were to be drawn in *plaintiffs'* favor, and (3) that summary judgment would be denied if the evidentiary facts, viewed in the light of those inferences, created any arguably material factual issue (see *Opinion I* at 847 n. 3).

10. [Footnote by this Court] As the next paragraph in the text demonstrates, our own Court of Appeals has recently relied on *G.A. Thompson's* statement of Section 20(a) principles, though not on the specific point just quoted here.

11. It should however be emphasized that the analysis that follows in the text firmly establishes Nortman's and Berrettini's good faith as a matter of law under the conventional *Harrison*-type formulation as well.

12. In the past our Court of Appeals has simply inquired as to the sufficiency of relevant control systems without examining the attendant state of mind of the control person.

13. *G.A. Thompson* in turn based its holding that mere negligence could not serve as a predicate for bad faith on the Supreme Court's footnote in *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 209 n. 28, 96 S.Ct. 1375, 1388 n. 28, 47 L.Ed.2d 668 (1976).

Though *Opinion I*'s examination of defendants' total lack of recklessness, and its preceding examination of defendants' lack of scienter in the more classic sense of bad faith (*id.* at 872–74), were undertaken in the course of rejecting plaintiffs' claims of outright fraud, those examinations and this Court's consequent holdings have equal force in resolving the issue of defendants' mindset for the present purpose. Yet now it is plaintiffs who beseech this Court to develop amnesia and to ignore those previous holdings. Even though they fail to present any new arguments, authority or evidence, plaintiffs effectively ask this Court to review its own perfectly sound earlier determinations for clear error. There is no reason whatever to revisit the same issues—yet in the interest of completeness this opinion will briefly review and summarize the factors that originally led this Court to conclude that there was no evidence (even with all reasonable inferences in plaintiffs' favor) to support a finding of recklessness on the part of defendants.

Throughout the relevant time period, responsibilities as to the oil venture were divided so that Bridges (the man with demonstrated experience in the field) oversaw the field operations while defendants handled the administrative and financial end of the business. Consistently with that arrangement, defendants established certain "control systems" designed to keep Bridges in check, especially once his actions began to raise suspicions. For example, after Bridges sought to split Ona's funds among himself and defendants, the latter promptly set up an escrow system to control the flow of money in Ona's account. Other precautions undertaken by defendants and recited in detail in *Opinion I* included their extensive checks into Bridges' background, numerous personal field inspections, the requirement of written progress reports and their reliance on a host of other knowledgeable people for verification, advice and guidance.

On the current motion P. Mem. 14 contends that such reliance was misplaced, and plaintiffs accuse defendants of having established an "illusory" system of control. But that argument has already been before this Court, and it has expressly held that defendants lacked the necessary expertise to perform meaningful independent review and that they were entirely justified in depending on the opinions of others about Bridges and about the conditions of the drilling areas. *Opinion I* at 875 summarized the only permissible conclusion from the evidence:

> In the total absence of any evidence showing that Nortman and Berrettini did not in fact undertake the investigations they claim to have made or that they had reason to know that their sources were unreliable, plaintiffs have failed to raise an issue of fact (even inferentially) as to any recklessness involved in their reliance on Bridges for technical information.

No reason has been presented by plaintiffs to merit any different conclusion in the present context—the evidence is the same, and the result must be the same.

In terms of any claim that defendants actually acted in bad faith (and inferentially in terms of the *Monieson*-approved recklessness standard of good faith), perhaps the most important evidence as to defendants' state of mind is the amount of their own effort and resources that they devoted to trying to rescue the struggling venture. It is uncontroverted that in June 1984 Nortman and Berrettini prevented Bridges from dividing and distributing approximately $230,000 of Ona's alleged "profits" among the three of them. Both sides similarly agree that Nortman and Berrettini deposited more than $100,000 of their own funds in an escrow account to help keep the project financially viable. In that respect *Opinion I* at 865 said (and this Court now reconfirms) that:

> It rings hollow to suggest that Nortman and Berrettini expended funds, which they were in no way required to provide, simply in an effort to protect their "investment," when that interest is defined as protecting their profits from the drilling of the wells. Because the drilling contracts were turnkey arrangements, their spending extra amounts on other efforts to make the already-drilled wells successful could not realistically be expected to extend or enhance the profits to be made from the contracts. Instead the only result, if the wells were in fact known to be dry, would

be to *deplete* the profits that Nortman and Berrettini could expect to walk away with at the completion of their fraud—hardly something that profit-minded crooks would volunteer. It is equally nonsensical to think that they would dissipate the profit from their fraud in an attempt to cover it up. If they knew the wells were dry, then only the continual spending of money until they ran out of funds would hide their tracks—leaving them with no fruits of their crime and a mob of angry investors.[14]

And it bears repeating that such implausibility on plaintiffs' part bears on a summary judgment motion such as this (*Matsushita Elec. Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)).

In summary, this Court holds that there is no basis—even with all reasonable inferences drawn in plaintiffs' favor—to support a conclusion that defendants lacked good faith in either sense of that term. First, protective measures that defendants put in place to supervise Bridges and the oil drilling operations satisfy the *Harrison* "control systems" test (974 F.2d at 880). Additionally, defendants' conduct exhibited total good faith "under the circumstances," given the nature of their relationship to the partnerships, the business realities of the situation and their conduct in trying to keep the project afloat (*G.A. Thompson,* 636 F.2d at 959). Finally, because there is no evidence to support an inference of recklessness on defendants' part in this action, the total evidence as to defendants' state of mind requires a finding of good faith as defined by our Court of Appeals' most recent pronouncement on the subject (*Monieson,* 996 F.2d at 860). To put the issue in terms of defendants' burden of proof on the good faith exception to Section 20(a), defendants have brought themselves squarely within the scope of that good faith exception as a matter of law.

### Conclusion

There is a substantial basis for finding that plaintiffs reached the current stage of these proceedings, with a claim still surviving, only by misleading our Court of Appeals into a "clearly erroneous" ruling. This Court so holds. But for both policy and jurisprudential reasons this Court would not be prepared to rest on such a determination short of the merits, even if it were empowered to do so. Instead it has determined on the merits that there is no genuine issue of material fact as to whether defendants had the good faith needed to negate any possible liability under Section 20(a)—they unquestionably did. Defendants are entitled to a judgment as a matter of law, and this action is at long last dismissed with prejudice.

---

14. [Footnote by this Court] It is also relevant to the implausibility of plaintiffs' argument that, as they would have it, Nortman's own father was one of the investors whom he is alleged to have cheated intentionally (*Opinion I* at 865).